Argued and submitted November 23, 2005, reversed and remanded
February 15, petition for review denied June 13, 2006 (341 Or 80)

## WAL-MART STORES, INC.,
### Rocky Younger
### and Janice Younger,
*Respondents,*

*v.*

## CITY OF OREGON CITY
### and Hilltop Properties, LLC,
*Petitioners.*

### 2004-124; A129946

129 P3d 702

William K. Kabeiseman argued the cause for petitioner City of Oregon City. With him on the brief were Edward J. Sullivan, Carrie A. Richter, and Garvey Schubert Barer.

Kelly S. Hossaini argued the cause for petitioner Hilltop Properties, LLC. With her on the brief were Phillip E. Grillo and Miller Nash LLP.

E. Michael Conners argued the cause for respondent Wal-Mart Stores, Inc. With him on the brief was Gregory S. Hathaway.

No appearance for respondents Rocky Younger and Janice Younger.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Petitioners, City of Oregon City and Hilltop Properties, LLC, seek review of a Land Use Board of Appeals (LUBA) opinion remanding a decision by the Oregon City Commission (commission) denying an application by respondent, Wal-Mart Stores, Inc. (Wal-Mart), to construct a retail facility within the city limits. LUBA's recitation of the basic facts are not disputed; we therefore include those facts below:

"The subject property is a 12.87-acre parcel zoned General Commercial in the City of Oregon City. [Wal-Mart] seeks to develop a 147,048-square foot commercial retail development, a Wal-Mart discount store, which is a permitted use in the zone. [Wal-Mart] applied for site plan and design review approval and a water resources approval, which the [commission] denied.

"The application the [commission] denied is [Wal-Mart's] second application to develop the property. The first development proposal (the 2003 Application) also involved a site plan application to build a Wal-Mart store, but it included a comprehensive plan and zone change proposal to redesignate several residentially planned and zoned adjacent parcels to General Commercial to use for the store's parking. [Wal-Mart] filed those applications concurrently. City staff recommended denial of the plan and zone change application and approval of the site plan. At the city's request, [Wal-Mart] agreed to bifurcate the applications so the city could consider the plan and zone change request before addressing the site plan. As part of the bifurcated process, the city conducted a hearing on the plan and zone change application but did not accept evidence regarding the site plan application. The city concluded that if the plan and zone change were approved, another hearing would be required for the site plan application. The planning commission denied the plan and zone change application and also denied the site plan application because it was contingent upon obtaining the plan and zone changes for parking. [Wal-Mart] appealed the denial to the [ ] commission, and the [ ] commission upheld the planning commission's denial.

"A few months after the [ ] commission denied the first application, [Wal-Mart] submitted a new application. The

new application revised the parking plan, eliminating the need for the adjacent residentially planned and zoned parcels and added multi-level parking. [Wal-Mart] also modified the building design to incorporate more of a 'main street' theme. The city processed the application as a limited land use decision. The planning manager denied the application, and petitioner appealed the decision to the [ ] commission, which upheld the planning manager's denial."

*Wal-Mart Stores, Inc. v. City of Oregon City*, 50 Or LUBA 87, 89-90 (2005) (footnote omitted).

LUBA reversed the commission's decision, agreeing with Wal-Mart's assertions that (1) the commission improperly denied the application under a code provision prohibiting further applications for similar proposals less than one year from denial of the initial application; (2) the commission improperly relied on evidence submitted beyond the 14-day limit for comment on an application as set out in ORS 197.195(3)(c)(A); and (3) the commission misconstrued a portion of its code requiring a percentage of "windows or transparency at the pedestrian level" at the front and side of the structure. Petitioners challenge LUBA's decision as incorrectly interpreting the applicable provisions of the city's code and the Oregon Revised Statutes in those instances. We agree with petitioners and reverse LUBA's determination.

■ We begin with LUBA's interpretation of Oregon City Municipal Code (OCMC) 17.50.220, which provides that,

"[i]f the application is denied or withdrawn following the close of the public hearing, no reapplication for the same or substantially similar proposal may be made for one year following the date of final decision denying the permit."

The commission interpreted that provision to "focus on the *use being proposed* and the impacts on the city's citizens; not on the reason for denial of the previous proposal or what parts of the previous proposal might be missing from the second proposal." (Emphasis added.) While the commission acknowledged that the present application differed from the 2003 application, it regarded the differences as

"largely cosmetic changes [that] do not change the 'substance' of the use proposed or the impacts of the use on the

City. For these reasons, the [ ] Commission finds that the current application is 'substantially similar' to the previous application denied by the Commission in 2003."

The commission stated that it was irrelevant that the earlier application had been divided into a zone and plan change proceeding and a separate site design review proceeding, and that only the zone and plan change proceeding had been considered and included a hearing. The commission's findings explain that the 2003 public hearing also addressed issues that were part of the site plan and design review application, and that OCMC 17.50.220 therefore applied to the new application. The commission ultimately interpreted OCMC 17.50.220

"to focus on the 'proposal' that was denied in the previous proceeding, not simply on the application. Because the site plan and design review was part of a larger 'proposal' for the construction of a Wal-Mart store, and that 'proposal' was denied after a public hearing, the Commission concludes that OCMC 17.50.220 is applicable to this application."

LUBA rejected the commission's reasoning, and stressed that the code contemplated that the subject matter of the new application "must have been actually considered in the prior application that was denied or withdrawn." *Wal-Mart*, 50 Or LUBA at 93. Accordingly, LUBA concluded that, because there was no public hearing on the 2003 site plan and design review application, and because the application on review did not involve an application for a plan and zone change, the commission erred in denying Wal-Mart's application based on OCMC 17.50.220. LUBA further reasoned that, had Wal-Mart resubmitted the same plan and zone change application, such an application would be of the type that would be precluded under OCMC 17.50.220.

■ Petitioners argue that LUBA's analysis does not give proper deference to the commission's interpretation of its own code. Petitioners cite ORS 197.829(1),[1] *Clark v. Jackson*

---

[1] ORS 197.829 provides:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

*County*, 313 Or 508, 836 P2d 710 (1992), and *Gage v. City of Portland*, 319 Or 308, 877 P2d 1187 (1994). Petitioners assert that LUBA supplanted the deferential review standard with a review under *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). In its brief, petitioner Oregon City argues that

> "[t]he *PGE* methodology seeks to determine the 'intent of the legislature' by relying first on the 'text and context' of an enactment. If the intent is clear from the text and context, nothing further need be examined. *Id.* at 611. This seems inconsistent with the explanation given for deference to a governing body's interpretation of its own ordinance given in *Gage*, which was decided after *PGE*. If the Supreme Court intended that review of such decisions under *Clark* and ORS 197.829(1) was to be based on the *PGE* template, without reference to the governing body's interpretation, the Supreme Court would have said so in *Gage*."

In *Church v. Grant County*, 187 Or App 518, 69 P3d 759 (2003), we stated that

> "[t]he specific language from *Clark* describing the proper scope of review is that 'LUBA is to affirm the county's inter- pretation of its own ordinance unless LUBA determines that the county's interpretation is inconsistent with express language of the ordinance or its apparent purpose or policy.' To the extent our summary description of the standard of review under *Clark* suggests that LUBA must sustain all but the most unreasonable interpretations of local land use controls, that description is inaccurate. The legitimacy of an interpretation of a local plan and ordinance provision depends on its consistency with the terms of the provision, the context of the provision, and the purpose or policy

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the compre- hensive plan provision or land use regulation implements.

"(2) If a local government fails to interpret a provision of its comprehen- sive plan or land use regulations, or if such interpretation is inadequate for review, the board may make its own determination of whether the local gov- ernment decision is correct."

behind the provision. Conversely, the validity of the interpretation is not determined solely by the reasonableness of an argument created to support it. The *Clark* decision and ORS 197.850(9), which was enacted after *Clark*, are more correctly characterized as consistent with the rules of construction announced in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

"That understanding is also consistent with ORS 197.829, which governs LUBA's standard of review. That provision requires LUBA to affirm a local government interpretation of its comprehensive plan and land use regulations unless LUBA determines that the interpretation is inconsistent with the express language of the plan or regulation, is inconsistent with the purpose of the plan or regulation, is inconsistent with the underlying policy providing the basis for the plan or regulation, or is 'contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements.' "

187 Or App at 524-25 (footnote and citations omitted). We adhere to our reasoning in *Church*. We see no inconsistency in following the steps of statutory interpretation articulated in *PGE* while also giving a local legislative body's interpretation and application of its own enactments some deference as discussed in *Clark* and *Church*.

Turning back to LUBA's interpretation of OCMC 17.50.220, we conclude that LUBA erred. The commission interpreted that provision to focus on the "proposal" for development and not on a particular application. That is, the commission read its code as prohibiting additional applications for the same proposal within one year of a denial of the initial application. Given that understanding, the fact that the 2003 application differed from the current application was irrelevant as to whether Wal-Mart had attempted to place more than one application before the city for the same proposal within one year of denial of its initial application. The commission's interpretation of OCMC 17.50.220 prohibiting additional applications within a year of a denial of a proposal for the same project is in keeping with the underlying policy supporting the prohibition—to avoid multiple reviews of the same project. Because the commission's interpretation of its code is consistent with the express language and underlying policy of OCMC 17.50.220, LUBA erred in rejecting it.

■     We next turn to LUBA's finding, pursuant to ORS
197.835(9)(a)(B), of a procedural error resulting in prejudice
to Wal-Mart. Under ORS 197.835(9)(a)(B), LUBA "shall
reverse or remand" a land use decision if the local govern-
ment decision-maker "[f]ailed to follow the procedures appli-
cable to the matter before it in a manner that prejudiced
the substantial rights of the petitioner[.]" The matter of the
Wal-Mart application was pending before the planning man-
ager as a limited land use decision. *See* ORS 197.195. As a
limited land use decision, following a determination that the
application was complete, notice was sent to nearby property
owners, and those receiving notice were advised of a statu-
tory 14-day limit to submit comments on the pending appli-
cation. ORS 197.195(3)(c)(A). Following the close of the com-
ment period, the planning manager accepted comments from
a traffic consultant, David Evans and Associates, and from
the Clackamas County Fire District and Public Works
Department. Notwithstanding the fact that ORS 197.195
does not provide for rebuttal of comments submitted within
the 14-day period, LUBA held that acceptance of the infor-
mation was a procedural error and that Wal-Mart should
have been afforded a right to respond to the new evidence.
LUBA reasoned that the more elaborate procedures for
developing evidence under the quasi-judicial process set out
in ORS 197.763 and the abbreviated process set out in ORS
197.195 serve the same purpose, and a right to respond to
evidence submitted after the 14-day period is not simply a
right of rebuttal, but a remedial action required to keep pro-
cedural error from prejudicing an applicant's substantial
rights (presumably to a fair and impartial process, although
LUBA did not articulate the nature of the substantial rights).

      LUBA's analysis is somewhat troubling as it appears
to ignore the commission's statement that Wal-Mart in fact
had an opportunity to rebut the comments. As we understand
the record, Wal-Mart took advantage of that opportunity and
addressed both the traffic consultant's report and that of the
Fire District. The commission explained that,

     "[Wal-Mart], and all other parties who submitted com-
     ments during the public comment period, have the right to

appeal the Planning Manager's decision to the [ ] Commission, as occurred in this case. That appeal results in a hearing before the [ ] Commission where the applicant or other parties may submit rebuttal argument and analysis, as well as providing written rebuttal argument and analysis prior to the Commission hearing. The applicant and all other parties were afforded this opportunity and the applicant took advantage of it by appearing at the Commission hearing and providing rebuttal argument."

Wal-Mart does not explain before the commission why the hearing was inadequate to address its concerns. In addition, Wal-Mart fails to explain what factual information it was unable to present and how that information (if any) affected the commission's final decision. Given those circumstances, along with the fact that the statutory scheme does not, in any event, provide for the rebuttal of comments submitted within the 14-day period, we fail to see how the commission's procedure caused the prejudice perceived by LUBA.

In its discussion, LUBA also rejected the commission's assertion that, even if it were error to accept the untimely comments without allowing petitioner an opportunity to respond, that error was harmless because the commission would have reached the same result without the additional information. The commission's findings state that it reviewed other evidence to determine whether Wal-Mart had demonstrated that the city's transportation system was adequate to support the use proposed "without relying in any way on the City's Traffic Report or any other document challenged by the applicant." The commission's findings go on to state that

"[t]he Commission has reviewed the reports prepared by ODOT [Oregon Department of Transportation] and Carl Springer and reaches the conclusion that the applicant's [Traffic Impact Analysis (TIA)] does not show that the City's transportation system is adequate to support the proposed use. In particular, the Commission notes that ODOT has identified problems with traffic volumes, queue storage lengths, improper analysis of 'overlap' at the 213/ Beavercreek Road intersection, and signal timing issues. In

addition, the memorandum of Carl Springer identifies additional problems; improper adjustment for seasonal factors, improper existing level of service, conflicting methods and findings (Synchro v. SimTraffic modeling) and identified failures of intersections. Based on the above, the Commission concludes that the applicant's TIA is not credible and the applicant has failed to show that the City's transportation system is adequate to support the proposed use."

(Internal citations omitted.)

LUBA essentially ignores the commission's findings and asserts that the city planning manager and the commission relied heavily on the evidence at issue. Nothing in the record or the commission's decision supports that assertion, however.[2] The commission relied on evidence not discussed in LUBA's opinion showing that Wal-Mart's traffic analysis failed to show that the city's transportation system was adequate to support the proposed use. That was sufficient to support the commission's decision.

■ We next turn to LUBA's rejection of the commission's conclusion that the proposed structure, in part, failed to meet a city code requirement for "windows or transparency." The code provision, OCMC 17.62.055(F)(2), provides:

"The main front elevation shall provide at least sixty percent windows or transparency at the pedestrian level. The side elevation shall provide at least thirty percent transparency. The transparency is measured in lineal fashion (For example, a one-hundred-foot long building elevation shall have at least sixty feet (60% of 100 feet) of transparency in length)."

The statement of purpose included in that section of the code provides:

"This section is intended to promote the design of an urban environment that is built to human scale and to encourage street fronts that create a pedestrian-conducive environment, while also accommodating vehicular movement. The

---

[2] Petitioners do not assert that the commission's findings relating to traffic impacts are not supported by substantial evidence. *See Younger v. City of Portland*, 305 Or 346, 356-60, 752 P2d 262 (1988).

primary objective of the regulations contained in this section is to provide a range of design choices that would promote creative, functional, and cohesive development compatible with the surrounding areas."

OCMC 17.62.055(A).

The commission offered an interpretation of the transparency requirement along with a finding that the requirement remained unsatisfied on the north elevation of the proposed building. In its findings, the commission stated,

"Regarding the north elevation (a side elevation requiring 30% transparency), the Commission's [sic] interprets the transparency requirement based on the purpose of the site plan and design review requirements as set forth in OCMC 17.62.055(A): 'to promote the design of an urban environment that is built to human scale and to encourage street fronts that create a pedestrian-conducive environment.' The Commission finds that simply 'allowing light to be transmitted through the material' (as alleged by [Wal-Mart]) does not meet the transparency requirement. [Wal-Mart]'s interpretation looks to the interior of the building, but the purpose of these regulations is on the exterior—the regulations focuses [sic] on the 'urban environment,' 'street fronts' and 'pedestrian conducive[ness].' The glass block wall provides no greater benefit to the streetscape than a concrete block wall. The Commission interprets the transparency requirement of OCMC 17.62.055(F)(2) to require the ability for pedestrians on the outside of a building to see into the building. Because the applicant's north elevation does not allow pedestrians outside of the building to have visual access in to the building, the [ ] Commission finds that the transparency requirement on the north elevation is not satisfied."[3]

LUBA interpreted OCMC 17.62.055(F)(2) to require "windows or transparency" as applying equally to both elevations, save for the percentage of the elevation that must meet the requirement. In that respect, LUBA appeared to agree with the commission's interpretation of its code, at

---

[3] The commission also found that the applicant's treatment of the west elevation failed to meet code requirements. LUBA rejected the commission's explanation, but petitioners do not challenge that aspect of LUBA's decision.

least as expressed with respect to the side elevation.[4] However, LUBA disagreed with the commission's interpretation as to what is meant by "windows or transparency." The commission, from the finding above, interpreted that provision to require that "pedestrians on the outside of a building to be able to see into the building." LUBA disagreed, stating,

> "[p]resumably, windows can be something other than a transparency. Otherwise, there would be no need to list both terms. In other words, if all windows were transparencies, then the addition of the word 'windows' would be superfluous. A window is commonly understood to include transparent and translucent openings. The windows proposed by [Wal-Mart] are translucent openings in the wall of the building, and therefore within the dictionary definition of the word. Under the [commission]'s stated purpose for the code, the city could have adopted a code provision that does not allow translucent windows. However, the current code does allow for them. The [commission]'s interpretation to the contrary is inconsistent with the express language of the code. The [commission]'s interpretation violates ORS 197.929(1) and *Church*."

*Wal-Mart Stores*, 50 Or LUBA at 104-05 (footnotes omitted). LUBA reached its conclusion by utilizing the dictionary definition of "window": "an opening in a wall of a building * * * to admit light [usually] through a transparent or translucent material (as glass) [usually] to permit vision through the wall * * * and often to admit air." *Webster's Third New Int'l Dictionary* 2620 (unabridged ed 2002). LUBA rested its view on the inclusion of "translucent material" in the definition of "window." It added, in a footnote, that the commission's

---

[4] Petitioners take issue with LUBA's application of the "windows or transparency" requirement to both the front and side elevations. Petitioners argue that the code states different requirements for the two elevations. According to petitioners,

> "the provision sets out two different requirements for the elevations. First, for the 'main front' elevation, the provision requires 60% 'windows or transparency.' However, for a side elevation, the provision requires 30% 'transparency;' there is no qualification or other alternative to 'transparency' for a side elevation; it does not mirror the 'main front' elevations [*sic*] allowance of 'windows' or transparency."

Petitioner argues that LUBA was mistaken because the commission did not interpret the two requirements as applying to the different facades in the same way, and it said to do so would be "reversible error." We express no opinion as to petitioners' argument.

suggestion that the code requires pedestrians to be able to see into the building is not stated in the code and is not supported by the stated purpose of the regulation. We disagree.

Whether one agrees with the commission's assertion that the code treats the specification as to "windows" or "transparency" for the front and side facades differently, and whether there is a difference implicit in the city code's use of the two terms, it is clear with respect to the side elevation that the code requires some form of "transparency." The commission articulated its understanding of the term as one requiring that pedestrians be able to see into the building, a reasonable interpretation given that "transparency" means "the quality or state of being *transparent*." *Webster's* at 2430 (emphasis added). "Transparent," in turn, is defined as "having the property of transmitting light without appreciable scattering so that bodies lying beyond are entirely visible[.]" *Id.* Wal-Mart proposed to use glass blocks that admit light, but are not transparent. The commission's conclusion that glass blocks do not meet the code requirement as applied to the side elevation is in keeping with the code's explicit requirement and with the evident policy behind the code provision, as articulated in OCMC 17.62.055(A) and explained in the commission's findings. Therefore, we disagree with LUBA's rejection of the commission's interpretation of OCMC 17.62.055(F)(2).

Reversed and remanded.