Argued and submitted August 11, reversed November 4, 2009

Wendy SIPOREN,
Ivend Holen
and Medford Citizens for Responsible Development,
*Respondents,*

*v.*

CITY OF MEDFORD
and Wal-Mart Stores, Inc.,
*Petitioners.*

Land Use Board of Appeals
2008185; A142541

220 P3d 427

John R. Huttl argued the cause and filed the brief for petitioner City of Medford.

Gregory S. Hathaway argued the cause for petitioner Wal-Mart Stores, Inc. With him on the brief were Jeff N. Evans and Davis Wright Tremaine LLP.

Kenneth D. Helm argued the cause and filed the brief for respondents.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Respondent City of Medford (the city) and inter-venor-respondent Wal-Mart Stores, Inc. (Wal-Mart) seek judicial review of an order of the Land Use Board of Appeals (LUBA) in which LUBA remanded the city's decision to approve a site development plan without requiring a more comprehensive traffic impact analysis than the one Wal-Mart provided. ORS 197.850(1). On judicial review, the legal issue is whether LUBA, pursuant to ORS 197.829, was required to affirm the city's interpretation that its code does not require a more comprehensive traffic impact analysis under these circumstances. Because we conclude that the city's decision is not "inconsistent with the express language" of the city's code, ORS 197.829(1)(a), LUBA's order is unlawful in substance, ORS 197.850(9)(a). Accordingly, we reverse.

Because it provides context for the parties' contentions, before turning to the facts, we explain the general structure of the Medford Land Development Code (MLDC) and the specific code provisions that inform the central issue in this case—*viz.*, whether a comprehensive analysis of the traffic impacts resulting from Wal-Mart's proposed store is necessary before the city may approve Wal-Mart's site plan and architectural review application.[1]

The MLDC is divided into six articles. Three articles are pertinent to our review—that is, Article I, Article II, and Article IV.

The city and Wal-Mart's interpretation of the code relies primarily on the provisions in Article II, the purpose of which is "to designate and define the responsibilities of the approving authorities and to set forth the procedural requirements and substantive criteria for plan authorizations and the development permit." MLDC 10.100. Article II provides for 13 different types of review, including site plan and architectural review as well as the review of zone

---

[1] The parties have adopted a shorthand convention of referring to traffic impact analyses (TIAs) that address level of service only at points of ingress and egress to a site as "limited" TIAs. Conversely, they refer to TIAs that address a broader study area, including points of ingress and egress as well as intersections where the development would potentially contribute 25 or more trips, as "comprehensive" TIAs. We adopt that convention as well.

changes. Those two distinct types of review are governed by different provisions of the MLDC.

The Site Plan and Architectural Commission (SPAC) conducts site plan and architectural review, which is governed by four provisions of the MLDC—that is, MLDC 10.285, MLDC 10.287, MLDC 10.290, and MLDC 10.291. MLDC 10.285 generally describes the site plan and architectural review process and provides, in part:

> "* * * The Site Plan and Architectural Review process is established in order to provide for review of the functional and aesthetic adequacy of development and to assure compliance with the standards and criteria set forth in this chapter for the development of property as applied to the improvement of individual lots or parcels of land as required by this code.
>
> "*Site Plan and Architectural Review considers consistency in the aesthetic design, site planning and general placement of related facilities* such as street improvements, off-street parking, loading and unloading areas, points of ingress and egress as related to bordering traffic flow patterns, the design, placement and arrangement of buildings as well as any other subjects included in the code which are essential to the best utilization of land in order to preserve the public safety and general welfare, and which will encourage development and use of lands in harmony with the character of the neighborhood within which the development is proposed."

(Emphasis added.)

Relatedly, MLDC 10.287 defines the content of a site plan and architectural review application. Generally, an application must contain particular information concerning landscaping and building construction. In addition to an architectural plan, the building construction section of the application requires site plan information, including information about (1) "[e]xisting and proposed off-street parking: location, number, type and dimensions of spaces, parking area, internal circulation pattern"; (2) "[a]ccess: pedestrian, vehicular, service, points of ingress and egress"; (3) "[s]treet dedication and improvements"; and (4) "[l]ocation of existing public improvements including streets, curbs, sidewalks, street trees, utility poles, light fixtures, traffic signs and

signals, and such other data as may be required to permit [SPAC] to make the required findings."

The nature of those findings is contained in MLDC 10.290. That provision states, in pertinent part:

"[SPAC] shall approve a site plan and architectural review application if it can find that the proposed development conforms, or can be made to conform through the imposition of conditions, with the following criteria:

"(1)    The proposed development complies with the *applicable* provisions of all city ordinances."[2]

(Emphasis added.)

Finally, under MLDC 10.291, the conditions that SPAC may impose include "[r]equiring the installation of appropriate public facilities and services and dedication of land to accommodate public facilities when needed"; "[r]equiring the improvement of an existing, dedicated alley which will be used for ingress or egress for a development"; and "[c]ontrolling the number and location of parking and loading facilities, points of ingress and egress and providing for the internal circulation of motorized vehicles, bicycles, public transit and pedestrians[.]"

In sum, the text of MLDC 10.285 and MLDC 10.287 demonstrates that SPAC is authorized to consider consistency in the aesthetic design, site planning, and general placement of related facilities. Specifically, SPAC reviews, *inter alia*, (1) the placement of facilities (*e.g.*, bus pullouts) as they relate to a specific site plan, (2) ingress and egress from the site, and (3) the movement of vehicles and pedestrians within the site. However, the express wording of the code provisions circumscribing SPAC's authority do not indicate that SPAC has broad authority to determine the adequacy of

---

[2] We note that the version of MLDC 10.290 quoted above is different from the version that LUBA quoted in its order. As pertinent to our review, the critical difference between the versions appears to be that subsection (2), to which LUBA and at least one of the parties on review referred, was apparently renumbered as subsection (1). For clarity, throughout this opinion, our quotations and references to MLDC 10.290 are to the version quoted above and, where necessary, we modify LUBA's and the parties' quotations and references to that code provision accordingly.

street capacity for development that constitutes a permitted use within the zone.

Instead, the adequacy of street capacity is determined during the review of zone changes, which is governed by an entirely separate provision, MLDC 10.227. Specifically, MLDC 10.227 provides that the Planning Commission—not SPAC—"shall approve a quasi-judicial zone change" if it finds, among other things, that the zone change complies with certain criteria.

One of those criteria is that the applicant demonstrate that "Category A urban services and facilities are available or can and will be provided, as described below, to adequately serve the subject property with the permitted uses allowed under the proposed zoning * * *." MLDC 10.227. Among the requirements of "Category A urban services and facilities" in MLDC 10.227(2) are:

"(b)  Adequate streets and street capacity must be provided in one (1) of the following ways:

"(i)  Streets which serve the subject property, as defined in Section 10.461(2), presently exist and have adequate capacity; or

"(ii)  Existing and new streets that will serve the subject property will be improved and/or constructed, sufficient to meet the required condition and capacity, at the time building permits for vertical construction are issued; or

"(iii)  If it is determined that a street must be constructed or improved in order to provide adequate capacity for more than one (1) proposed or anticipated development, the Planning Commission may find the street to be adequate when the improvements needed to make the street adequate are fully funded."[3]

---

[3] Relatedly, MLDC 10.235, which governs the approval of preliminary planned unit developments (PUD), provides that, if such a development includes a use that is not allowed in the underlying zone, the applicant—as would be true of an applicant who requested a zone change—must demonstrate the adequacy of public facilities such as streets. Specifically, MLDC 10.235(C)(5) provides, in part:

"If the Preliminary PUD Plan includes uses not allowed in the underlying zone pursuant to Subsection 10.230(D)(7)(c), the applicant shall alternatively demonstrate that either: 1) demands for the Category 'A' public facilities listed below are equivalent to or less than for one or more permitted uses listed for the underlying zone, or 2) the property can be supplied by the time of development with the following Category 'A' public facilities which can be supplied in sufficient condition and capacity to support development of the proposed use:

In sum, MLDC Article II allocates authority among different decision-making entities. The Planning Commission has authority to determine the adequacy of street capacity to serve permitted uses before approving a zone change. Conversely, in reviewing a site plan application, SPAC has authority to consider consistency in the aesthetic design, site planning, and general placement of related facilities.

Unlike Article II, which allocates authority among decision-makers, MLDC Article I contains provisions that "apply to the general provisions, administration and enforcement" of the MLDC, including broad definitions of the terms "development" and "developer" on which petitioners rely, and Article IV contains provisions that apply to "the establishment and application of development standards for public improvements." MLDC 10.007. Of particular pertinence to our review here, Article IV includes MLDC 10.460 to 10.462, the code provisions that petitioners invoke—and on which LUBA relied—as precluding the city from approving the site plan without requiring a more comprehensive traffic impact analysis than the one Wal-Mart provided.

Among other things, a TIA "identif[ies] the traffic impacts that a proposed development will have on the existing and future street network" and "determines all improvements or mitigation measures necessary to maintain adequate [levels of service] at study area intersections and ensure safe pedestrian and vehicular ingress to and egress from the transportation system."[4] MLDC 10.460. A TIA is required when

---

"\* \* \* \* \*

"d. Public streets.

"Determinations of compliance with this criterion shall be based upon standards of public facility adequacy as set forth in the Code \* \* \*."

[4] One element of a TIA is an analysis of the "level of service," a concept described in the city's Transportation System Plan as follows:

"Intersection levels of service (LOS) for signalized intersections are grades of A through F that are used to rate the intersection performance within a specified time period, typically the AM or PM peak hour. \* \* \* Progressively higher LOS reflect increasingly worse intersection performance, with higher levels of control delay and increased congestion and queues. \* \* \*

"The City of Medford's *Comprehensive Plan* has established LOS standards that are intended to guide roadway design and improvement priorities by establishing a threshold for determining the level of delay that is unacceptable

"a proposed application has the potential of generating more than 250 net average daily trips * * * or the Public Works Department has concerns due to operations or accident history, a TIA will be required to evaluate development impacts to the transportation system."

MLDC 10.461(3). Nonetheless, "[t]he level of detail and scope of a [TIA] will vary with the size, complexity, and location of the proposed application." MLDC 10.461(1). For that reason, the Public Works Department issues a "scoping letter" that defines the study area of the TIA. The study area

"shall address at least the following areas:

"(a)   All proposed site access points;

"(b)   Any intersection where the proposed development can be expected to contribute 25 or more trips during the analysis peak period. * * *; and

"(c)   Any intersections directly adjacent to the subject property."

MLDC 10.461(2). Apparently, based on the outcomes of a TIA,

"[w]henever level of service is determined to be below level D for arterials or collectors, *development* is not permitted unless the *developer* makes the roadway or other improvements necessary to maintain level of service D respectively."[5]

MLDC 10.462 (emphasis added).

---

to the community, thus triggering a roadway or intersection improvement. Currently the acceptable LOS threshold is LOS D or better. Under its current application, this standard requires that zone change decisions not allow increases in traffic that would exceed Level of Service D."

Moreover, Transportation Goal 2, Policy 3, of the "Public Facilities Element" of the "Goals Policies and Implementation" section of the city's comprehensive plan requires that

"Arterial Streets shall be designed and improved so that the minimum overall performance during peak travel periods should be service level 'D.' Land use *designations and development* should not cause this minimum level of service to be exceeded during peak hours."

(Emphasis added.)

[5] A "developer" is a person or entity "who or which causes the development of real property and is the owner of record or owner under contract to purchase or lease for purposes of development, the real property to be developed or improved." MLDC 10.012. In turn, "development" is "[t]he improvement of a parcel of land; including partitioning or subdividing of any improved or unimproved real property, for any purpose, and by any person, association, or other entity." *Id.* We do not understand the city or Wal-Mart to contend that the proposed store is not "development" or that Wal-Mart is not a "developer."

As we will amplify shortly, the references to "development" and "developer" are central to petitioners' contentions (and LUBA's conclusion) that the provisions of MLDC 10.462 were applicable and controlling here. Specifically, petitioners contend, and LUBA agreed, that, because the proposed Wal-Mart store is a "development," the provisions of Article IV required SPAC consideration and approval of a comprehensive analysis of the traffic impacts resulting from the proposed store before the city may approve Wal-Mart's application. Ultimately, the issue for purposes of our review reduces to whether, given the allocation of functions described and prescribed in Article II, the city's contrary construction of its code is "inconsistent with the express language." ORS 197.829(1)(a).

With that background concerning the structure of the MLDC and the nature of TIAs—and with the legal issue clearly in mind—we turn to the material facts, which we take from LUBA's order and the record. Wal-Mart seeks to build a 176,335-square-foot retail store on 18.5 acres in the city. The city's previous decisions with respect to Wal-Mart's applications have resulted in two prior appeals to LUBA, *see Siporen v. City of Medford*, 55 Or LUBA 29 (2007); *Wal-Mart Stores, Inc. v. City of Medford*, 49 Or LUBA 52 (2005), and, as LUBA indicated, "[t]he procedural twists and turns that this matter has taken do not make for easy reading." *Siporen*, 55 Or LUBA at 31. It is sufficient to note that, as pertinent to our review, LUBA's remands in those two cases ultimately directed the city to apply MLDC 10.462 to its review of Wal-Mart's site plan and architectural review application or explain the reason that it does not apply under these circumstances. *See Siporen*, 55 Or LUBA at 53, 56; *Wal-Mart Stores, Inc.*, 49 Or LUBA at 64.

Following LUBA's remand in *Siporen*, Wal-Mart filed an application concerning its proposed store—that is, the application that is the subject of our review—with SPAC. Wal-Mart also submitted a "limited" TIA. Before SPAC, petitioners Siporen, Holen, and Medford Citizens for Responsible Development (MCRD) raised issues concerning the traffic impacts of the proposed development. Specifically, Siporen and MCRD squarely raised the legal issue that LUBA had previously remanded—namely, that the city needed "to

explain why it was not requiring [Wal-Mart] to provide a comprehensive traffic analysis under [MLDC] 10.462 and related provisions of the Medford Code."[6]

SPAC rejected petitioners' arguments and determined "that the project [was] in compliance" with MLDC 10.290(1)—that is, that "[t]he proposed development * * * complies with the applicable provisions of all city ordinances." In that regard, SPAC determined that, contrary to petitioners' premise, for purposes of MLDC 10.290(1), MLDC 10.462 was not "applicable." According to SPAC, MLDC 10.462 is "applicable at the time of zone change"—and not at the time of SPAC's review of a site plan and architectural review application. Ultimately, SPAC approved Wal-Mart's application.

Petitioners appealed SPAC's approval to the city council. Petitioners noted that "Wal-Mart [had] submitted a revised traffic impact analysis" but that the analysis "was limited to studying the ingress and egress points for the store's parking areas" and that "[t]he impacts on nearby intersections were not part of this revised TIA." (Underscoring in original.) Consistently with their position before SPAC, the gravamen of petitioners' position before the council was that (1) MLDC 10.460 to 10.462 operate collectively to require a more comprehensive TIA than the one that Wal-Mart had submitted; and (2) the text of those code provisions was inconsistent with the city's "informal policy of requiring a comprehensive TIA only at the time of zone change."

As did SPAC, the city council approved Wal-Mart's application. The council did not focus specifically on the meaning of MLDC 10.462; rather, the council's analysis pertained, broadly, to the scope of SPAC's authority as described in MLDC Article II. *See* 231 Or App at 587-91 (describing provisions). Ultimately, the council concluded that SPAC had been correct in determining that "the facility adequacy of arterial and collector streets under MLDC 10.462 is *vested with the Planning Commission at time of zone change, and*

---

[6] As we understand the parties' arguments, a "comprehensive" TIA must comply with MLDC 10.462.

*not SPAC whose authority over transportation issues is defined and limited * * *.*" (Emphasis added.) Accordingly, the council determined that MLDC 10.462 did not apply to SPAC's review of Wal-Mart's application so as to require a comprehensive TIA.

Petitioners appealed the city council's decision to LUBA. Before LUBA, the essential nature of the parties' positions remained constant.

In particular, petitioners reiterated that (1) SPAC cannot approve an application unless it "complies with the applicable provisions of all city ordinances." MLDC 10.290(1); (2) given their structure and content, MLDC 10.460 to 10.462 necessarily operate in concert to prohibit "development" if the level of service for arterials or collectors falls below level of service D unless roadway or other improvements necessary to maintain level of service D are made; and (3) Wal-Mart is a "developer" that submitted an application for "development." Consequently, petitioners asserted that the city erred by not requiring Wal-Mart to prepare a comprehensive TIA to demonstrate that its proposed development complies with the requirement in MLDC 10.462 to maintain level of service D.

Conversely, the city and Wal-Mart, focusing on code provisions related to the scope of SPAC's authority (*e.g.*, MLDC 10.285 - 10.290), contended that MLDC 10.462 was inapplicable to site plan and architectural review. As Wal-Mart explained,

"the City fully explained in its findings why [MLDC] 10.462 is not an applicable requirement for site plan and architectural review. The essence of those findings is that the site plan and architectural review code provisions ([MLDC] 10.285 - 10.290) neither authorize SPAC to review comprehensive TIA[s] nor otherwise require such an analysis for site plan and architectural review applications. If the City intended to require such an analysis for site plan and architectural review applications, it would have done so expressly as it has done for other types of land use reviews, such as zone changes. As the City explained in its findings, the City determines the adequacy of the transportation system to accommodate permitted uses at the time of zone change, not upon review of a site plan architectural review

application for a permitted use. Petitioners offer an alternative interpretation, but fail to explain why [MLDC] 10.462 overrides the explicit requirements of the site plan and architectural review standards. The City's interpretation of its Code regarding the allocation of duties and responsibilities among its decision-making bodies is entitled to deference."

(Record citations omitted.)

In sum, the parties' positions were essentially "two ships passing in the night." On the one hand, petitioners contended that, because MLDC 10.460 to 10.462 apply to "development" and the site plan application for Wal-Mart's store concerned "development," SPAC could not approve Wal-Mart's application without a comprehensive TIA. On the other, the city and Wal-Mart contended that, because, under the allocation of functional responsibility described in MLDC Article II, SPAC is not authorized to require or review a comprehensive TIA, MLDC 10.462 is inapplicable.

Ultimately, LUBA rejected the city's and Wal-Mart's arguments and remanded the city's decision. After examining the code provisions on which the city and Wal-Mart relied, LUBA rejected their contention that SPAC's scope of authority was limited so as to render MLDC 10.462 inapplicable in this context. In so holding, LUBA concluded that "the city's interpretation finds *almost no support*" in the text of the code provisions on which the city relied and that, "[g]iven the *paucity of textual support* for the city's interpretation of MLDC 10.290([1]), we cannot defer to that interpretation." (Emphasis added.) LUBA further observed, in remanding the city's decision, that "[t]he city will need to amend MLDC 10.290([1]) if it wishes to approve development site plans without applying MLDC 10.461 and 10.462."

On judicial review of LUBA's decision, the parties reiterate their respective positions concerning the correct interpretation of the city's code under these circumstances. However, beyond that—and dispositively here—the city and Wal-Mart contend that, regardless of the *relative* correctness of the parties' differing interpretations, LUBA erred in failing to sustain the city's interpretation of its code because that interpretation was not "inconsistent with the express

language" of the code. ORS 197.829(1)(a).[7] According to Wal-Mart,

"LUBA evaluated various provisions of the text and reached its own conclusions as to how the text should be interpreted. In every instance where the text could be interpreted in one of two ways, LUBA chose to discount the textual and contextual support cited by the City, and instead provided its own support for the alternative interpretation. In so doing, LUBA failed to acknowledge that the text is capable of supporting more than one interpretation, and that the City's reconciliation of conflicting provisions should be given deference. LUBA's approach is error as a matter of law."

Petitioners disagree, contending that

"[the city] and Wal-Mart both argue that LUBA conducted a comparative analysis between the city's interpretation of the code and * * * MCRD's interpretation of the code, and improperly substituted its judgment for that of the city. That is not the case. In the appeal below * * * MCRD presented LUBA with a set of arguments that showed that the provisions of Article IV [that govern development standards for public improvements] and MLDC 10.290([1]) explicitly contradicted the city's contextual rationalization for determining that a TIA is 'only required at the time of rezoning.'

"Below, LUBA expressly identified that its job was to determine whether the city's interpretation was sustainable under ORS 197.829(1)—'not whether petitioners' interpretation is better or sustainable.'"

---

[7] ORS 197.829 provides, in part:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements."

Accordingly, petitioners contend, "LUBA understood its task was to consider whether the text and context of MLDC 10.290([1]) supported the city's view that a TIA under MLDC 10.461 and 10.462 is only required at the time of rezone." In sum, petitioners conclude, "LUBA correctly found that the text and context of [the city's] development code does not support the city's interpretation that a comprehensive [TIA] is only required at the time of rezoning and that MLDC 10.461 and 10.462 do not apply to site plan review applications."

As correctly understood, the issue on judicial review is whether LUBA's order is "unlawful in substance," ORS 197.850(9)(a), because, in rendering that order, LUBA failed to comply with the standard of review prescribed in ORS 197.829(1)(a): LUBA must affirm the city's interpretation of its code unless that interpretation is "inconsistent with the express language" of the code. In *Foland v. Jackson County*, 215 Or App 157, 164, 168 P3d 1238, *rev den*, 343 Or 690 (2007), we described the meaning of "inconsistency" for purposes of ORS 197.829:

"Whether a local government's interpretation of its ordinance is 'inconsistent' with the language of the ordinance depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993)]."[8]

Thus, on review in this case, our task is to determine whether, based on the express language of the code, the city's interpretation concerning the applicability of MLDC 10.462 is *"plausible"* in light of the interpretive principles of *PGE*. *Foland*, 215 Or App at 164 (emphasis added). That is, LUBA's task—and now ours in reviewing whether LUBA's order comports with ORS 197.829(1)(a)—is not to determine

---

[8] *Accord Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 209, 214 P3d 68 (2009) (applying methodology from *Foland*); *Wal-Mart Stores, Inc. v. City of Oregon City*, 204 Or App 359, 365, 129 P3d 702, *rev den*, 341 Or 80 (2006) (noting the concept of deference to a local government's interpretation of its own enactments as described in *Gage v. City of Portland*, 319 Or 308, 877 P2d 1187 (1994), *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), and *Church v. Grant County*, 187 Or App 518, 69 P3d 759 (2003); concluding that "[w]e see no inconsistency in following the steps of statutory interpretation articulated in *PGE* while also giving a local legislative body's interpretation and application of its own enactments some deference * * *").

whether the city's interpretation of its code was "correct" in some absolute sense of choosing among various plausible interpretations, but, instead, merely whether that interpretation satisfied *PGE*'s first level threshold of plausibility. If it does, then, under ORS 197.829(1)(a), LUBA should have, and we must, sustain that interpretation, even if another interpretation might be "better" or more sensible or persuasive.

■■   We turn then to whether the city's interpretation of its code in this case is plausible. The parties proceed from the same starting point, *viz.*, MLDC 10.290(1), a provision that requires SPAC to approve an application if the proposed development, among other things, complies "with the *applicable* provisions of all city ordinances."[9] (Emphasis added.) But their respective treatments of what are "applicable" provisions for purposes of SPAC's review in this context differ diametrically. As noted, petitioners contend that the provisions of MLDC 10.460 to 10.462 are "applicable" in such a way as to compel Wal-Mart's submission, and SPAC's consideration, of a comprehensive TIA. Conversely, the city and Wal-Mart contend that the allocation in MLDC Article II of SPAC's functions as distinguished from, *e.g.*, the Planning Commission's responsibility with respect to zoning substantiates its interpretation that MLDC 10.462 is not "applicable" here as to petitioners' argument.

We agree with petitioners that the city's interpretation of its code pertaining to whether MLDC 10.462 is "applicable" for purposes of MLDC 10.290(1) appears to be "inconsistent with the express language," ORS 197.829(1)(a), of the former—but that is true only if MLDC 10.462 is read in isolation. When MLDC 10.462 is read in conjunction with other contextually pertinent code provisions relating to the scope of SPAC's review responsibilities, the city's contrary interpretation is *"plausible." Foland*, 215 Or App at 164

---

[9] We pause to note that, as LUBA indicated, a land use regulation that is worded like MLDC 10.290(1) is

"almost always a bad idea, because it invites disputes in individual land use proceedings over what ordinance requirements are 'applicable.' A far better practice is to specify the ordinance provisions that apply or at the very least to provide some guidance regarding which provisions apply."

We agree with LUBA's assessment in that regard.

(emphasis added). Consequently, LUBA erred, under ORS 197.829(1)(a), in failing to affirm that interpretation.

We return to the city's rationale for its interpretation. As Wal-Mart explains, "[t]he key to the City's interpretation of what provisions are applicable to site plan review is the understanding that its review bodies have different roles and responsibilities, and those roles and responsibilities are dictated by Article II (Sections 10.100 - 10.296) of the MLDC." Accordingly, those provisions—and specifically those pertaining to SPAC's authority and scope of review, *e.g.*, MLDC 10.285, MLDC 10.287, and MLDC 10.290—are pertinent context for determining whether MLDC 10.462 is "applicable" to the development proposed in this site plan review. *See PGE*, 317 Or at 611 (reasoning that, "at the first level of analysis, the court considers the context of the statutory provision at issue, which includes other provisions of the same statute and other related statutes"); *Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 209-10, 214 P3d 68 (2009) (explaining that "the 'consistency with the express language' inquiry looks at the text of the plan provision or the regulation in question, as well as the context of other parts of the plan or regulation that are relevant to the textual meaning of that 'express language' ").

The city has expressly indicated that the purpose of Article II of the MLDC is "to designate and define the responsibilities of the approving authorities and to set forth the procedural requirements and substantive criteria for plan authorizations and the development permit." MLDC 10.100. As noted, the city has provided for 13 different types of review in Article II. Specifically, as pertinent here, the review of a proposed zone change by the Planning Commission and the review of a site plan by SPAC are two distinct types with different requirements and purposes. To be sure, as petitioners correctly point out, there is no express statement in the MLDC that a comprehensive TIA is required only at the time of rezoning. However, given the text and context of the code provisions on which the city relied, the city plausibly interpreted its code to allocate authority among its decision-making entities and, in so doing, limit the scope of authority of each entity.

MLDC 10.227 expressly provides that the Planning Commission must determine that street capacity is adequate to "serve the subject property with the permitted uses" allowed in a zone before it approves a zone change. Following a zone change, when specific sites are proposed, MLDC 10.285 expressly provides that SPAC must consider "consistency in the aesthetic design, site planning and general placement of related facilities." The general placement of related facilities includes the review of "points of ingress and egress as related to bordering traffic flow patterns," MLDC 10.285; however, the express wording of the code provisions governing SPAC's authority does not include authority to generally review street capacity and the adequacy of the transportation system for each permitted use within the zone—which is what petitioners in this case seek. For those reasons, the city plausibly determined that MLDC 10.462 does not apply to SPAC's review of Wal-Mart's application.

The thrust of petitioners' opposing position on review is that the city's interpretation cannot be reconciled with various code provisions, which, in petitioners' view, the city has essentially ignored. To support their contention, petitioners rely on *Hodge Oregon Properties, LLC v. Lincoln Cty.*, 194 Or App 50, 93 P3d 93 (2004), and *Just v. City of Lebanon (A122516)*, 193 Or App 121, 88 P3d 307 (2004). However, those cases are materially distinguishable.

In *Hodge Oregon Properties, LLC*, an applicant sought a conditional use permit to site a nonforest dwelling on property, part of which was zoned "Timber Conservation" (TC). 194 Or App at 52. A neighbor opposed the application because the applicant had not demonstrated that "the dwelling and its septic system would be located entirely within the TC zone." *Id.* The county approved the application, reasoning that the dwelling itself would be sited in the TC zone and that the siting of the septic system was not a part of its decision. *Id.* at 52-53. LUBA disagreed, concluding that, because a "dwelling" was defined to include a septic system, the county erred. *Id.* at 53. On review, we affirmed, relying, as did LUBA, on the fact that a "dwelling" was defined to include "sanitation" (*e.g.*, a septic system). *Id.* at 54. We concluded that the county's approval of the "dwelling" as a conditional

use without a demonstration that the proposed structure had sanitation was "inconsistent with the express language" of its code. *Id.* at 54-55 (citing ORS 197.829(1)(a)).

In *Just*, LUBA remanded the city's annexation and zoning designation, concluding that the city could not approve an annexation without a specific development proposal. 193 Or App at 123, 125. We affirmed, rejecting the city's argument that LUBA should have deferred to the city's interpretation because (in the city's view) that interpretation " 'was consistent with the plain language of the ordinance and consistent with the City's plans and policies governing annexations.' " *Id.* at 124. We reasoned that Urbanization Element Annexation Policy 3 of the Lebanon Comprehensive Plan included a mandatory requirement that a specific development proposal accompany annexation requests " '[u]nless otherwise approved by the city.' " *Id.* at 127 (brackets in original). Although it was unclear from the text of the exception whether the city could defer the requirement of a specific development proposal until after the approval of the annexation, other annexation and public facilities policies made it clear that the city would consider specific development proposals at the time that it made its annexation decision. *Id.* at 128-29.

In *Hodge* and *Just*, the text of local enactments examined in context *foreclosed* the local government's interpretations. That is not the case here. Fundamentally, because there is no code provision that expressly indicates the type or types of development review in which MLDC 10.462 applies, the parties' arguments are entirely contextual and the code provisions on which either party relies do not foreclose the other party's interpretation. Notwithstanding that neither party's contentions fully harmonize all cited provisions of the city's code, both parties present plausible interpretations of the code. Under such circumstances, LUBA must affirm the city's interpretation. Because LUBA did not do so here, its order is unlawful in substance. Accordingly, we must reverse.

Reversed.