Argued and submitted December 6, 2016, affirmed June 28, 2017

Patricia REINERT,
*Petitioner,*

*v.*

CLACKAMAS COUNTY
and Lennar Northwest, Inc.,
*Respondents.*

Land Use Board of Appeals
2016049; A163389

398 P3d 989

Dorothy S. Cofield argued the cause for petitioner. With her on the brief was Cofield Law Office.

Kelly S. Hossaini argued the cause for respondent Lennar Northwest, Inc. With her on the brief was Miller Nash Graham & Dunn LLP.

No appearance for respondent Clackamas County.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and DeHoog, Judge.*

———————
* Hadlock, C. J., *vice* Flynn, J. pro tempore.

**SERCOMBE, P. J.**

This case concerns whether the Land Use Board of Appeals (LUBA) erred in affirming a county hearings officer's approval of a subdivision application. Petitioner contends that LUBA erred in sustaining the hearings officer's interpretation of two code provisions applicable to the application, one that bars a refiling of "the same or substantially similar [subdivision approval] application" within two years of the "final denial" of an earlier application, and the other that requires preservation of "significant clumps or groves of trees" in a subdivision plat "whenever feasible" and consistent with the "needs of the development." On review, we conclude that LUBA's interpretation of the intended meaning of the ordinances and its understanding of its substantial evidence standard of review were correct, and, accordingly, affirm.[1]

We take the uncontested facts from the LUBA opinion under review and from a previous opinion of this court on a related development application, *Lennar Northwest, Inc. v. Clackamas County*, 280 Or App 456, 380 P3d 1237 (2016), *rev den*, 360 Or 752 (2017). Respondent Lennar Northwest, Inc. (Lennar),

> "owns a 16.77-acre parcel of land located in the Jennings Lodge neighborhood of Clackamas County. That neighborhood is in an unincorporated area north of Gladstone, and is bounded on the west by the Willamette River. The property was formerly used as a religious camp and conference center and is improved with institutional dwellings, an auditorium, and other structures. The property is zoned Immediate Urban Low Density Residential R-10 (R-10) under the Clackamas County Zoning and Development Ordinance (ZDO), a zoning district that generally requires a minimum lot size of 10,000 square feet."

*Id.* at 458; *see* ZDO 315.04 (Table 315-2).

In *Lennar Northwest, Inc.*, Lennar sought a zone change from R-10 to Immediate Urban Low Density Residential R-8.5 (R-8.5), a zoning district that generally requires

---

[1] In a companion case, *Friends of Jennings Lodge v. Clackamas County*, 286 Or App 526, 396 P3d 967 (2017), petitioner Friends of Jennings Lodge seeks review of the LUBA order under review in this case, contending that LUBA erred in affirming the county's determination that the two subdivision applications are not "substantially similar."

a minimum lot size of 8,500 square feet, to increase the number of lots in a proposed subdivision plat, and also sought approval of a 72-lot flexible lot subdivision and an associated stormwater outfall. The county denied all three of the applications in a consolidated order, concluding that an approval criterion for the zone change, pertaining to the "need for neighborhood preservation," *see id.* at 461, was not satisfied, and that the associated subdivision and storm-water facility applications should be summarily denied because their approval depended upon the denied upzoning. On review, LUBA remanded the denials, concluding that the hearings officer improperly applied the rezoning criteria. We affirmed LUBA's decision to remand. *Id.* at 471.

While review of the denials of the applications was pending, Lennar filed a second subdivision-approval application with the county, this time under the unchanged R-10 zoning. That application proposed a 62-lot subdivision with larger lots, fewer vehicle trips per day, additional on-street parking, wider streets, a dedicated tract for the tree stand adjacent to the river, and a different stormwater detention system. Both the R-8.5 subdivision and the subject R-10 sub-division, however, had the same street alignment and both allowed development of lots in the middle of the subdivision in place of several stands of trees.

Before the hearings officer, petitioner contended that the subdivision application was inconsistent with various code-approval criteria, including ZDO 1307.16(K), which prohibits, with some exceptions, a second application for the "same or substantially similar" permit or approval during the two years following the final denial of the initial application.[2]

---

[2] ZDO 1307.16(K) provides:

"Re-filing an Application: If a Type II or III land use permit application is denied * * * pursuant to Subsection 1307.16(L), an applicant may re-file for consideration of the same or substantially similar application only if:

"1. At least two years have passed after either final denial of an application by the County or revocation of a permit; or

. "2. The review authority finds that one or more of the following circumstances render inapplicable all of the specific reasons for the denial:

"a. A change, which is material to the application, has occurred in this Ordinance * * *;

"b. A mistake in facts, which was material to the application, was considered by the review authority;

The hearings officer concluded that the two subdivision-approval applications in question—the earlier subdivision proposed on R-8.5 zoned property and the current one on R-10 zoned property—were not substantially similar because the later request sought approval of a reduced number of lots (72 to 62 lots), an increase in the average lot size (from 7,828 square feet to 9,669 square feet), 100 fewer vehicle trips per day, additional on-street parking, and a different stormwater detention system. In the view of the hearings officer, the most significant difference between the applications was that the first application was based on a higher-density zoning (R-8.5) and the later request was for a lower-density subdivision of land under the R-10 zoning that remedied the zoning-inconsistency reason for denying the first application.

Before LUBA, petitioner asserted that the hearings officer had incorrectly concluded that the two applications were not substantially similar. According to petitioner, "[t]here is little doubt that the two applications are substantially similar—both applications involved residential subdivisions of over 60 lots, with a similar functional layout of streets and utilities." Specifically, petitioner contended that ZDO 1307.16(K) pertains to whether the subsequent application is "'substantially similar,' not whether the applications are 'substantially different.' The key is not what is different, but what is the same."

LUBA upheld the hearings officer's interpretation of "substantially similar" as involving a "high degree of similarity." Quoting from one of its own earlier cases in which it had construed the same ZDO provision, *Henkel v. Clackamas County*, 56 Or LUBA 495, 501 (2008), LUBA concluded that "substantial similar[ity]" required more equivalence than mere similarity:

"c. There have been changes in circumstances resulting in new facts material to the application;

"d. A change has occurred in the zoning of the subject property, or adjacent property, that substantially affects the merits of the application; or

"e. There have been substantial changes in the surrounding area, or on the subject property, such as availability of services or improvements to public facilities, that affect the merits of the application."

(Underscoring in original.)

"'By preventing the refiling of applications that are "substantially similar" the ZDO requires a greater degree of similarity than would be required if the standard were merely "similar" applications. In other words, applications must not only be similar, they must be very similar. We agree with petitioner that the plain meaning of "substantially similar" is that under [ZDO 1307.16(K)] a second application is barred within two years of the first application's denial only when there is a high degree of similarity.'"

LUBA concluded that the hearings officer properly applied the "high degree of similarity" test "because of the many ways in which [the] R-10 Subdivision application does not have a high degree of similarity to the R-8.5 Subdivision application."

On review, petitioner contends that LUBA's decision is unlawful in substance, *see* ORS 197.850(9)(a), because its substantial similarity test focuses more on the differences in the applications' contents than on the similarities between the two proposals. Petitioner argues that the applications are "almost exactly the same—a substantial residential subdivision of large-lot homes with minimal tree preservation, the same street layout and same utility structure, and the same removal of the historic Jennings Lodge Retreat."

According to petitioner, a test that focuses on the similarities between the two applications is compelled by our construction of an analogous code provision in *Wal-Mart Stores, Inc. v. City of Oregon City*, 204 Or App 359, 129 P3d 702, *rev den*, 341 Or 80 (2006). We reject that contention. In *Wal-Mart Stores, Inc.*, we did not analyze the correct construction of an analogous "substantially similar" provision. Instead, we merely deferred to the city's interpretation of the provision in question as plausible under ORS 197.829.[3]

In *Wal-Mart Stores, Inc.*, the company applied for site plan approval of a large commercial retail development

---

[3] Under ORS 197.829, LUBA must affirm a local government's interpretation of a land use regulation that is not inconsistent with the text of regulation and related policies. The statute requires deference to a construction of a law only when that interpretation is plausible, given the text and context of the provision. *Siporen v. City of Medford*, 349 Or 247, 243 P3d 776 (2010).

as well as a comprehensive plan and zone change from residential to commercial for the surrounding properties to allow those properties to share in the planned parking lot for the store. 204 Or App at 361. The City of Oregon City held a hearing on, and then denied, the plan and zone change request, and then denied the site plan approval because it was contingent on the rezoning being allowed. A short time later, Wal-Mart submitted a new site plan approval application that revised the parking plan by adding multi-level parking and eliminated the parking for the adjacent properties. The city applied a code provision that limited reapplication for a denied "proposal":

> "'[I]f the application is denied or withdrawn following the close of the public hearing, no reapplication for the same or substantially similar proposal may be made for one year following the date of final decision denying the permit.'"

*Id.* at 362 (quoting Oregon City Municipal Code 17.50.220). The city commission interpreted the provision to "'focus on the *use being proposed* and the impacts on the city's citizens; not on the reason for denial of the previous proposal or what parts of the previous proposal might be missing from the second proposal.'" *Id.* (emphasis in *Wal-Mart Stores, Inc.*). Because the second site plan approval application proposed "'largely cosmetic changes [that] do not change the "substance" of the use proposed or the impacts of the use on the City,'" the commission denied the application as untimely. *Id.* at 362-63.

LUBA rejected the commission's reasoning, concluding that the subject matter of the new application "'must have been actually considered in the prior application that was denied or withdrawn.'" *Id.* at 363. On review, we concluded that LUBA had erred in failing to defer to the commission's interpretation of its code provision to "focus on the 'proposal' for development and not on a particular application." *Id.* at 365. We explained that the commission's interpretation of the provision as prohibiting "additional applications within a year of a denial of a proposal for the same project" was plausible because it was consistent with the "express language and underlying policy of" the code provision. *Id.*

Our determination in that case that a local government had plausibly interpreted a "substantially similar" code provision does not control our assessment, in this case, of whether the hearings officer correctly construed *its* "substantially similar" code provision. There may be multiple plausible interpretations of a land use regulation that are not inconsistent with the text of the provision and related policies. However, the question whether an interpretation of a code provision is correct under the statutory construction rules set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), is an altogether different inquiry. As we recently noted in *Kaplowitz v. Lane County*, 285 Or App 764, 775, 398 P3d 478 (2017),

> "we emphasize that the plausibility determination under ORS 197.829(1) is not whether a local government's code interpretation best comports with principles of statutory construction. Rather, the issue is whether the local government's interpretation is plausible because it is not expressly *inconsistent* with the text of the code provision or with related policies that 'provide the basis for' or that are 'implemented' by the code provision, including any ordained statement of the specific purpose of the code provision at issue."

(Emphasis in original.) Even so, despite using a different test to measure substantial similarity, local government interpretation of the provision in *Wal-Mart Stores, Inc.*, to preclude reapplication for the "same project" with only "cosmetic changes," 204 Or App at 362-63, is consistent with the hearings officer's construction of its ordinance in this case to preclude applications that have a "high degree of similarity" to an earlier-denied application.

Petitioner further argues that the exceptions to the bar on refiling the same or a substantially similar application in ZDO 1307.16(K)(2) support its understanding of the meaning of "substantially similar." ZDO 1307.16(K) allows the filing of the same or substantially similar applications if, among other things, a "change has occurred in the zoning of the subject property, or adjacent property, that substantially affects the merits of the application" or if there have been "substantial changes in the surrounding area, or on the

subject property, such as availability of services or improvements to public facilities, that affect the merits of the application." Petitioner argues that the lack of a zone change or any substantial changes in the availability of services or improvement to public facilities between the time that the two applications were filed, means that the applications are "substantially similar" for purposes of ZDO 1307.16(K).

The exceptions in ZDO 1307.16(K) have only limited value in defining the meaning of substantial similarity. Instead, they define circumstances in which a same or substantially similar application can be processed short of the two-year window. In other words, the exceptions presuppose that the applications at issue are the same or "substantially similar." The fact that the exceptions allow the same or a similar application to be considered early if there has been a change of external circumstances implies only that substantial similarity is assessed on the basis of any equivalence between the two subdivision plats, and not on facts that are external to the plats and related approvals.

By that measure, as noted, petitioner argues that the only consideration in assessing whether applications are "substantially similar" is the degree to which the proposals are the same, and that an analysis that focuses on the differences between the two applications, apart from the content of their similarities, is deficient. Of course, a comparison between the two proposals to determine the degree of substantial similarity must necessarily look at both the similarities and the differences between the applications. Whether the applications are "substantially similar" or have a "high degree of similarity" depends upon whether there are material differences in the content of both applications with respect to application of the approval criteria.

The core criterion for approval of a preliminary subdivision plat under ZDO 1105.03(A) is that "[t]he proposed subdivision * * * compl[ies] with the applicable provisions of Section 1000, *Development Standards*." Section 1000, in turn, lists standards applicable to all development applications. The standards particularly relevant to land divisions pertain to the arrangement of uses on property, including protection of natural features (ZDO 1002), the availability

of public services and facilities and roads (ZDO 1006, 1007, and 1008), and density (ZDO 1012). ZDO 1105.02 also states the requirements for a submission of a subdivision application and emphasizes—in addition to technical platting requirements—information on the availability of domestic water supply and wastewater disposal and the calculation of the proposed density or number of lots as consistent "with the minimum and maximum density standards of Section 1012, *Density*."

As noted, the county concluded that key material differences between the two applications with respect to density, and to a lesser extent, the provision of public facilities (*i.e.*, road design, stormwater detention) supported the conclusion that the two applications were not "substantially similar." Those material differences were the reason for the denial of the first application (because it was too dense) and the approval of the second one (because it was less dense and arranged the roads and public facilities accordingly).

In light of those differences, we conclude that the two applications were not substantially similar under ZDO 1307.16(K). Thus, with respect to this assignment of error, LUBA did not err in determining that the county's decision "compl[ied] with applicable provisions of the land use regulations," ORS 197.828(2)(b), and its order was not "unlawful in substance" under our standard of review, ORS 197.850 (9)(a).

Petitioner contends in her second assignment of error that the county and LUBA erred in their interpretation and application of a tree preservation ordinance to allow removal of significant stands of trees in the middle of the plat and another in the eastern part of the subdivision. Petitioner argues that the ordinance should be interpreted to require a redesign of the subdivision plat, using planned unit development design standards, to allow fewer or smaller lots and preservation of more trees if that redesign is otherwise "feasible" to meet the needs of development. Petitioner asserts that there is insufficient evidence that Lennar considered alternative plat designs that would allow more tree preservation and that, in fact, the existence of alternative

plat designs was evidence that the tree preservation policy was not satisfied.

ZDO 1002.04(A) requires that "wooded areas" and "significant clumps or groves of trees * * * shall be incorporated in the development plan wherever feasible." It requires balancing of those features "with the needs of the development" but not in a way that "preclude[s] development of the subject property, or require[s] a reduction in the number of lots or dwelling units that would otherwise be permitted." The ordinance then lists various "[s]ite planning and design techniques" to "address incorporation of trees and wooded areas in the development plan" that include "[u]se of flexible-lot-size and planned unit development designs to minimize disturbance of wooded areas."[4]

---

[4] ZDO 1002.04(A) provides:

"Existing wooded areas, significant clumps or groves of trees and vegetation, consisting of conifers, oaks and large deciduous trees, shall be incorporated in the development plan wherever feasible. The preservation of these natural features shall be balanced with the needs of the development, but shall not preclude development of the subject property, or require a reduction in the number of lots or dwelling units that would otherwise be permitted. Site planning and design techniques which address incorporation of trees and wooded areas in the development plan include, but are not limited to, the following:

"1. Siting of roadways and utility easements to avoid substantial disturbance of significant clumps or groves of trees;

"2. Preservation of existing trees within rights-of-way and easements when such trees are suitably located, healthy, and when approved grading allows;

"3. Use of flexible road standards as provided in Subsection 1007.04(B)(3), including one-way roads or split-level roads, to preserve significant trees and avoiding unnecessary disturbance of terrain;

"4. Retention of specimen trees or clumps of trees in parking area islands or future landscape areas of the site as provided for in Section 1009;

"5. Use of wooded areas of the site for recreation, or other low-intensity uses, or structures, not requiring extensive clearing of large trees, grading, or filling activity which substantially alters the stability or character of the wooded area;

"6. Retention of trees which are necessary to ensure the stability of clumps or groves of trees considering the type of trees, soil and terrain conditions, exposure to prevailing winds, and other site-specific considerations;

"7. Use of trees and wooded areas to buffer, screen, or provide transitions between different or conflicting uses on and off the site;

"8. Use of flexible-lot-size and planned unit development designs to minimize disturbance of wooded areas;

Lennar's proposed subdivision would preserve approximately 90 of the 423 trees on the property. Most of the trees to be preserved are located along the steep western boundary of the property. The majority of the trees to be removed are located in the middle of the property on land that is to be subdivided into residential lots. Petitioner and other opponents took the position that the proposed subdivision allowed the removal of too many trees under ZDO 1002.04(A), and that the subdivision could be redesigned to divide the property into fewer lots, or redesigned as a planned unit development to have smaller lots, in a way that would allow open space in the middle of the development for the preservation of trees.

The hearings officer determined that Lennar's application satisfied ZDO 1002.04(A) in its explanation of both the different alternative subdivision plans that were considered and rejected and the design techniques that were used to preserve trees. One of those design techniques was the use of flexible lot sizes under ZDO 1002.04(A)(8) "to create larger lots with restricted development areas to protect large groups of trees on the western boundary of the property." The hearings officer determined that the "application gives an adequate explanation for attempting to preserve existing trees balanced against the need for designing a 62-lot subdivision," the maximum number of lots allowed under the R-10 zoning. The hearings officer concluded that alternative subdivision or planned unit development designs proposed by opponents were adequately rebutted by Lennar. Most of those alternatives proposed fewer than 62 lots. The hearings officer, interpreting the phrase "shall not *** require a reduction in the number of lots or dwelling units that would otherwise be permitted," concluded that a reduction from the density allowed by the zoning district is not required by ZDO 1002.04(A). For those proposals that retained 62 lots, and based on testimony by petitioner's

---

"9. Siting of uses and structures to utilize the natural microclimates created by wooded areas and trees to reduce extremes in temperature, provide wind protection, filter pollutants, and replenish oxygen and moisture to the air; and

"10. Use of other development techniques described in Subsection 1011.03(C)."

arborist, the hearings officer concluded that those proposals were not feasible because they were inconsistent with subdivision lot and roadway standards.

Before LUBA, petitioner argued that the county erred in concluding that a reduction in density or in the number of lots was not necessary to comply with ZDO 1002.04(A). Petitioner pointed to comprehensive plan and ordinance provisions that require or encourage tree preservation and argued that those policies should be given primacy in the application of ZDO 1002.04(A) so as to reduce the needs of the development to fewer lots. Petitioner argued that the "needs of development" under the ordinance refers to the minimum density allowed in the zone, not the maximum density. Petitioner contended that Lennar was obliged to prove why subdivisions of fewer lots or planned unit developments with clustered and smaller lots would not be feasible. Petitioner also asserted that the county's determination under ZDO 1002.04(A) was not supported by substantial evidence.

LUBA concluded that the hearings officer's interpretation of ZDO 1002.04(A) was consistent with the express language of the provision. In LUBA's view, the ordinance balanced tree preservation with the needs of the development, and required tree preservation "only when that preservation (1) would not reduce the number of lots that are permitted, and (2) is 'feasible' given the 'needs of the development.'" LUBA concluded that the design technique in ZDO 1002.04(A)(8) ("[u]se of flexible-lot-size and planned unit development designs to minimize disturbance of wooded areas") did not require an applicant "to prove in the first instance that a [planned unit development] would not meet the needs of development, would be infeasible, or would result in a reduction in the number of lots." Finally, LUBA concluded that Lennar's arborist reports, tree plans, and responses to petitioner's expert "are evidence that a reasonable decision maker would rely on to find that ZDO 1002.04(A) is met."

On review, petitioner contends that LUBA erred in construing ZDO 1002.04(A) to inhibit tree preservation that would require a "reduction in the number of lots * * * that

would otherwise be permitted" in the "absence of protection of trees." Petitioner argues that construing "otherwise be permitted" to mean otherwise be permitted "in the absence of protection of trees" adds additional language to the ordinance, improperly tips the ordinance to favor development instead of tree protection, and is inconsistent with the earlier wording of the provision that requires the incorporation of existing wooded areas and tree groves "in the development plan wherever feasible." Petitioner further asserts that ZDO 1002.04(A) requires an applicant to prove that a planned unit development that saves more trees is not feasible, and LUBA erred in concluding to the contrary. Finally, petitioner argues that LUBA was wrong in concluding that substantial evidence supported the county's conclusion of compliance with ZDO 1002.04(A).

Petitioner's proposed construction of ZDO 1002.04(A) would require the county to assess whether a different development plan than proposed by the developer could be used to preserve additional trees while still meeting the "needs of the development." In petitioner's view, the "needs of the development" means the needs of the developer to develop the property within the limits of the allowed minimum and maximum dwelling units or lots. That interpretation of the ordinance, however, is inconsistent with its text and context. *See Gaines*, 346 Or at 171-72 (legislative enactments must be construed based primarily on the text and context of the provision, together with any legislative history of the enactment that may be offered by the parties, and then, if necessary, based on general maxims of statutory construction).

As noted, ZDO 1002 is part of a series of code sections prescribing "development standards" that apply to partitions, subdivisions, institutional, commercial, and industrial developments, manufactured dwelling parks, condominiums, and multifamily dwellings. ZDO 1001.01(A). ZDO 1002 is titled "Protection of Natural Features" and was adopted "to implement the policies of the Comprehensive Plan for the protection of natural features." ZDO 1002.01.[5] The section

---

[5] ZDO 1002.04 implements Policy 6.1 in the "Forests" part of the "Natural Resources and Energy" section of the Clackamas County Comprehensive Plan:

contains policies regulating development of hillsides, trees and wooded areas, river and stream corridors, deer and elk winter range, Mount Hood resource protection open space, and significant natural areas. ZDO 1002.04(A), as noted, contains policies on the incorporation of significant tree groves or wooded areas into development plans "wherever feasible" through the use of various "development techniques."

ZDO 1002.04(A) begins with the requirement that "[e]xisting wooded areas [and] significant clumps or groves of trees and vegetation * * * shall be incorporated in the development plan wherever feasible." The plain meaning of that provision is that wooded areas and significant tree groves must be "incorporated in" a proposed plan for particular development (here, the 62-lot subdivision) when it is feasible to do so; that is, when the preserved wooded area or tree grove can be retained consistently with the proposed development. Petitioner's reading of the ordinance has the tail wagging the dog. According to petitioner, the provision requires that an indeterminate amount of permitted development be incorporated in a tree preservation plan so that preservation of trees drives the nature of the development, rather than the nature of the development in "the development plan" producing the degree of required tree preservation.

The second sentence of the provision reiterates the direction in the first sentence that the extent of the development determines the degree of tree preservation: "The preservation of these natural features shall be balanced with the needs of the development, but shall not preclude development of the subject property, or require a reduction in the number of lots or dwelling units that would otherwise be permitted." The "needs of the development" refers to "the development plan" discussed in the first sentence. The "balanc[ing]" of tree preservation that is required by the second

"Implement tree conservation standards in conjunction with the processing of design review, land division, and conditional use applications to minimize and regulate removal of trees and other vegetation and protection of trees during construction."

The plan policy plainly provides that tree conservation standards are implemented through the processing of particular development proposals to minimize the removal of trees needed to allow that development proposal.

sentence pertains to the "feasib[ility]" of preserving trees "in the development plan" in the preceding sentence.

The third sentence of ZDO 1002.04(A) details the manner in which the incorporation of trees and wooded areas can occur "in the development plan": "Site planning and design techniques which address incorporation of trees and wooded areas in the development plan include, but are not limited to, the following: * * *." Thus, taken as a whole, ZDO 1002.04(A) requires the incorporation of various "[s]ite planning and design techniques" to preserve trees in "the development plan" proposed by a developer when those techniques are "feasible," that is, capable of being used in the proposed development plan. The ordinance, however, does not require a plan to incorporate development techniques that would result in a different amount or type of development than proposed in the development plan.

Under the same reasoning, ZDO 1002.04(A) does not require the incorporation of site planning and design techniques "in the development plan" that cannot be used for that type of plan. As noted, the provision applies to approval of partitions, subdivisions, and other institutional, commercial, industrial, or multifamily residential developments. ZDO 1001.01(A). When the ordinance requires the feasible "[u]se of * * * planned unit development designs to minimize disturbance of wooded areas," in "the development plan," it refers to those development plans that are planned unit developments. What the ordinance does not require, however, is the recasting of a development plan into a planned unit development, in order to determine whether planned unit development techniques should be incorporated into "the development plan." The development plan is the one proposed by Lennar.

Petitioner finally contends that LUBA erred in concluding that ZDO 1002.04(A) is supported by substantial evidence in the record. *See* ORS 197.828(2)(a) (requiring the board to reverse or remand a limited land use decision, such as a subdivision approval, if the decision is not supported by "substantial evidence in the record"). LUBA concluded that "a reasonable decision maker could conclude in this case,

based on the evidence in the record submitted by" Lennar and its experts, "that ZDO 1002.04(A) is met."

We have repeatedly emphasized that this court reviews LUBA's application of the substantial evidence rule for legal correctness and does not review the evidence independently for substantiality. As we explained in *Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008):

> "Stated another way, LUBA considers all the evidence in the entire record in evaluating whether a factual finding is supported by substantial evidence and determines whether a reasonable person could make that finding. *Younger* [*v. City of Portland*, 305 Or 346, 356, 752 P2d 262 (1988)]. We review LUBA's determination of the substantiality of the evidence for a local government finding on whether the LUBA opinion is 'unlawful in substance' under ORS 197.850(9)(a). *Our task is not to assess whether the local government erred in making a finding, but to determine whether LUBA properly exercised its review authority.* Thus, we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record. *Instead, we evaluate whether LUBA properly stated and applied its own standard of review.* If LUBA does not err in the articulation of its substantial evidence standard of review under ORS 197.835(9)(a)(C), we would reverse LUBA's decision only when there is no evidence to support the finding or if the evidence in the case is 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.' *Younger*[ *v. City of Portland*, 305 Or 346, 359, 752 P2d 262 (1988)]."

(Emphases added.) LUBA properly stated and applied its substantial evidence standard of review. Furthermore, there is ample evidence to support the finding on ZDO 1002.04(A). We reject petitioner's second assignment of error.

In light of the foregoing, we conclude that the LUBA opinion and order was not "unlawful in substance" under ORS 197.850(9)(a).

Affirmed.