Argued and submitted April 12, reversed in part and remanded, otherwise affirmed July 12, 2023

Ted M. COOPMAN,
Paul T. Conte, and Gary Nance,
*Petitioners,*

*v.*

CITY OF EUGENE,
Al Johnson, Home Builders Association of Lane County,
Eliza Kashinsky, Joshua Kashinsky, Anne Brown,
Patty Hine, Isaac Judd, Angie R. Marzano, Sigh O'Nara,
Babe O'Sullivan, Bill Randell, Carleen Reilly,
Seth Sadofsky, Kevin Shanley, Heather Sielicki,
Sue Wolling, 1000 Friends of Oregon,
Better Housing Together, and DEVNW,
*Respondents,*

*and*

Christopher DEEL,
*Respondent below.*

Land Use Board of Appeals
2022056; A180682

534 P3d 1105

Petitioners seek review of a final order of the Land Use Board of Appeals (LUBA) that rejected their challenge to respondent City of Eugene's adoption of Ordinance No. 20667 ("the ordinance"). The city adopted the ordinance amending the Eugene Code and the Eugene-Springfield Metropolitan Area General Plan (Metro Plan) in response to a directive from the legislature to allow more "middle housing"—duplexes, triplexes, quadplexes, cottage clusters, and townhomes—in cities. Petitioners challenged the city's adoption of the ordinance before LUBA and LUBA affirmed the city's decision. Petitioners seek review, raising three assignments of error. In their first assignment, petitioners contend that LUBA erred in affirming the city's determination that the ordinance complied with Goal 11 of the Statewide Land-Use Planning Goals, OAR 660-015-0000(11), relating to public facilities and services. In their second assignment of error, petitioners contend that LUBA erred in affirming the city's construction of law and the city's findings that the ordinance did not implicate and therefore did not violate Goal 15, relating to development on the Willamette River Greenway, OAR 660-015-005. In their third assignment of error, petitioners contend that LUBA erred in upholding the ordinance because, according to petitioners, the ordinance's terms "dwelling unit size" and "income-qualified middle housing" did not provide clear and objective standards, in violation of ORS 197.307(4). *Held*: To satisfy ORS 197.175(2)(a), cities and counties "shall *** amend and revise" their comprehensive plans "in compliance with" the statewide planning goals. Eugene Code applies similar requirements to amendments to the code and Metro Plan. Those requirements are stated in the present tense. They do not allow the city to

amend the plan and regulations based on an assertion that, at some point in the future, the city will update its plans to account for development allowed by the amendments in a way that will comply with the goals. As a result, LUBA erred when it affirmed the city's conclusion that it did not have to consider the impact of the amendments to the Eugene Code and Metro Plan on its provision of public facilities and services at the time it adopted them. The Court of Appeals rejected petitioners' second and third assignments of error and affirm the parts of LUBA's opinion challenged by those assignments.

Reversed in part and remanded; otherwise affirmed.

Charles W. Woodward, IV argued the cause and filed the brief for petitioners.

Lauren A. Sommers argued the cause and filed the brief for respondent City of Eugene.

Bill Kloos and Law Office of Bill Kloos PC filed the brief for respondent Home Builders Association of Lane County.

No appearance for respondents Al Johnson, Eliza Kashinsky, Joshua Kashinsky, Anne Brown, Patty Hine, Isaac Judd, Angie R. Marzano, Sigh O'Nara, Babe O'Sullivan, Bill Randell, Carleen Reilly, Seth Sadofsky, Kevin Shanley, Heather Sielicki, Sue Wolling, 1000 Friends of Oregon, Better Housing Together, and DEVNW.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed in part and remanded; otherwise affirmed.

**SHORR, P. J.**

Petitioners seek review of a final order of the Land Use Board of Appeals (LUBA) that rejected their challenge to respondent City of Eugene's adoption of Ordinance No. 20667 ("the ordinance"). The city adopted the ordinance in response to a directive from the legislature to allow more "middle housing"—duplexes, triplexes, quadplexes, cottage clusters, and townhomes—in cities. Specifically, the legislature enacted a middle housing statute, the majority of which is codified as ORS 197.758,[1] to require cities to permit those housing options in areas previously zoned exclusively for single-family dwellings. The legislature set deadlines by which the cities had to update their local ordinances or amend their comprehensive plans or, alternatively, be forced to apply a model ordinance until they adopted their own. Or Laws 2019, ch 639, § 3. The city timely adopted its own ordinance, Ordinance No. 20667, that amended the Eugene Code and the Eugene-Springfield Metropolitan Area General Plan (Metro Plan).

Petitioners challenged the city's adoption of the ordinance before LUBA and LUBA affirmed the city's decision. Petitioners now seek review, raising three assignments of error. In their first assignment, petitioners contend that LUBA erred in affirming the city's determination that its comprehensive plan and code amendments complied with Goal 11 of the Statewide Land-Use Planning Goals, OAR 660-015-0000(11). As we explain below, we agree with petitioners that LUBA erred in that regard and that the city did not adequately address Goal 11 in its findings. We reject petitioners' second assignment of error, which contends that LUBA erred in affirming the city's construction of law and the city's findings that the ordinance did not implicate Goal 15 (relating to development on the Willamette River Greenway), OAR 660-015-0005, and therefore did not violate that goal. We summarily reject petitioners' third assignment of error, which contends that LUBA erred in upholding the ordinance because, according to petitioners, the ordinance's

---

[1] The legislature recently passed House Bill (HB) 3395 (2023), which amended ORS 197.758. Those amendments do not affect our analysis, however, and we cite to the current version of the statute throughout this opinion.

terms "dwelling unit size" and "income-qualified middle housing" did not provide clear and objective standards, in violation of ORS 197.307(4). As a result, we affirm LUBA's decision in part, reverse in part, and remand for further proceedings.

The "facts" before LUBA are simply a recitation of the enactment of the laws relating to middle housing that preceded this dispute. As a result, the parties do not contest them. We use the same background facts provided by LUBA:

"This appeal concerns the city's adoption of [the ordinance amending the Eugene Code and Metro Plan] implementing House Bill 2001 (2019), a portion of which is codified at ORS 197.758 and which we refer to as the Middle Housing Statute. Or Laws 2019, ch 639, § 2.

"The Middle Housing Statute requires large cities, including Eugene, to allow duplexes, triplexes, quadplexes, townhouses, and cottage clusters on properties zoned for residential use that allow for the development of detached single-family dwellings. The Middle Housing Statute required the city to amend its comprehensive plan [or] adopt land use regulations not later than June 30, 2022. Or Laws 2019, ch 639, § 3(1)(b). Had the city failed to implement the Middle Housing Statute within that time, then the city would have been required to directly apply a model ordinance adopted by the Land Conservation and Development Commission (LCDC). *Id.* § 3(2), (3). LCDC adopted administrative rules implementing the Middle Housing Statute at OAR chapter 660, division 46. LCDC also adopted a model code for large cities, which is Exhibit B to OAR 660-046-0010.

"The Middle Housing Statute does not prohibit local governments from permitting single-family dwellings in areas zoned to allow for single-family dwellings or from allowing middle housing in areas not required under the statute. ORS 197.758(6). The [ordinance] do[es] not require or trigger the development of middle housing. The choice to construct middle housing is left to the developer or property owner.

"Rather than adopting LCDC's model code, the city adopted the [ordinance] to allow for the development of middle housing types on residentially zoned properties

where the development of detached single-family dwellings is allowed. In some respects, the [ordinance] exceed[s] the minimum requirements of ORS 197.758 and OAR chapter 660, division 46, based on the city's policy choice to encourage and, in some cases, incentivize the development of middle housing."

(Footnote omitted.) In its opinion, LUBA further referred to the factual findings that the city made when enacting the ordinance. We quote those findings at length within our discussion of petitioners' assignments of error, because petitioners' legal arguments are partially driven by its contention that LUBA erred in affirming the city's findings.

We turn to the applicable standard of review before addressing petitioners' assignments of error. Petitioners challenge LUBA's order as "unlawful in substance" under ORS 197.850(9)(a). Petitioners' challenge therefore asks us to review whether LUBA correctly applied the law. Within that challenge, petitioners contend both that LUBA misinterpreted the law and that LUBA erred in affirming the city's legislative findings of fact in support of the ordinance. We review LUBA's interpretation of the law for legal error. *See Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001) (LUBA decision is "unlawful in substance *** if it represent[s] a mistaken interpretation of the applicable law"). As to the facts, our review of LUBA's decision affirming the city's factual findings is different from our ordinary factual standard of review in other agency cases:

"We review LUBA's determination of the substantiality of the evidence for a local government finding on whether the LUBA opinion is unlawful in substance under ORS 197.850(9)(a). Our task is not to assess whether the local government erred in making a finding, but to determine whether LUBA properly exercised its review authority. Thus, we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record. Instead, we evaluate whether LUBA properly stated and applied its own standard of review. If LUBA does not err in the articulation of its substantial evidence standard of review under ORS 197.835(9)(a)(C), we would reverse LUBA's decision

> only when there is no evidence to support the finding or if the evidence in the case is so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review."

*Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008) (internal quotation marks omitted). In other words, we review "LUBA's application of the substantial evidence rule for legal correctness and do[] not review the evidence independently for substantiality." *Reinert v. Clackamas County*, 286 Or App 431, 446, 398 P3d 989 (2017).

We start with the law that informs this dispute. Under existing statewide planning laws, local governments must adopt comprehensive plans that are consistent with the Statewide Land Use Planning Goals. ORS 197.175(2)(a) ("Pursuant to ORS chapters 195, 196 and 197, each city and county in this state shall *** [p]repare, adopt, amend and revise comprehensive plans in compliance with goals approved by [LCDC]."). Comprehensive plans must be "prepared to assure that all public actions are consistent and coordinated with the policies expressed through the comprehensive plans." ORS 197.010(1)(d); *see also* ORS 197.175(2)(b), (d) (requiring each city and county to "[e]nact land use regulations to implement their comprehensive plans," and, "[i]f [the city or county's] comprehensive plan and land use regulations have been acknowledged by [LCDC], make land use decisions and limited land use decisions in compliance with the acknowledged plan and land use regulations").

To implement that framework, Eugene has its own laws relating to planning. Eugene Code (EC) 9.8065(1) provides that the city may adopt an amendment to its land use code that "[i]s consistent with applicable statewide planning goals adopted by [LCDC]." EC 9.8065(2) provides that amendments must also be "consistent with applicable provisions of the [city's] comprehensive plan and applicable adopted refinement plans." EC 9.7735 further provides that the city council apply certain criteria in approving or denying a Metro Plan amendment application, including that "[t]he proposed amendment is consistent with the relevant Statewide Planning Goals." EC 9.7735(1).

We turn to the relevant statewide planning goals. Goal 2 provides in relevant part that "[c]ity *** plans and actions related to land use shall be consistent with the comprehensive plans of cities" adopted under law. OAR 660-015-0000(2). Goal 11 provides that local governments are "[t]o plan and develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development." OAR 660-015-0000(11). The goal requires cities like Eugene to "develop and adopt a public facility plan for areas within an urban growth boundary." *Id.* The goal defines key terms and phrases such as "a timely, orderly, and efficient arrangement" and a "public facility plan":

> "**A Timely, Orderly and Efficient Arrangement**—refers to a system or plan that coordinates the type, locations and delivery of public facilities and services in a manner that best supports the existing and proposed land uses.
>
> "* * * * *
>
> "**Public Facilities Plan**—A public facility plan is a support document or documents to a comprehensive plan. The facility plan describes the water, sewer and transportation facilities which are to support the land uses designated in the appropriate acknowledged comprehensive plan ***."

*Id.* (boldface in original). Goal 11 also provides guidelines, some of which apply to urban areas like Eugene. Planning Guideline 3 provides: "Public facilities and services in urban areas should be provided at levels necessary and suitable for urban uses." *Id.* Further, Implementation Guideline 3 provides: "The level of key facilities that can be provided should be considered as a principal factor in planning for various densities and types of urban and rural land uses." *Id.*

Thus, under Oregon's statutory land-use framework and Eugene's code, the amendments to the Metro Plan had to be consistent with Goal 11, and the amendments to the Eugene Code, in turn, had to be consistent with the Metro Plan as well as Goal 11.

As noted, the legislature enacted the middle housing statute in 2019. Or Laws 2019, ch 639. That law requires that Eugene, as a city "with a population of 25,000 [people] or more,"

"allow the development of

   "(a)   All middle housing types in areas zoned for residential use that allow for the development of detached single-family dwellings; and

   "(b)   A duplex on each lot or parcel zoned for residential use that allows for the development of detached single-family dwellings."

ORS 197.758(2); Or Laws 2019, ch 639, § 2(2). The law provides that, "[n]otwithstanding ORS 197.646," which provides the ordinary procedures for amendments to comprehensive plans to comply with new land use statutes or rules after plans are acknowledged by LCDC, a city like Eugene "shall adopt land use regulations or amend its comprehensive plan" no later than June 30, 2022, or, if it fails to do so, "shall directly apply" a model ordinance developed by LCDC.[2] Or Laws 2019, ch 639, § 3(1)(b), (3). Cities are permitted to regulate the siting and design of middle housing "provided that the regulations do not, individually or cumulatively, discourage *** development *** through unreasonable costs or delay. Local governments may regulate middle housing to comply with protective measures adopted pursuant to statewide land use planning goals." ORS 197.758(5).

       LCDC adopted regulations following the enactment of the middle housing statute. As relevant to this dispute, LCDC adopted OAR 660-046-0010, which elaborates on the legislative directive that "[l]ocal governments may regulate middle housing to comply with protective measures adopted pursuant to statewide land use planning goals." ORS 197.758(5). OAR 660-046-0010(3) provides, in part:

   "A Medium or Large City may regulate Middle Housing to comply with protective measures (including plans, policies, and regulations) adopted and acknowledged pursuant to statewide land use planning goals. Where Medium and Large Cities have adopted, or shall adopt, regulations implementing the following statewide planning goals, the following provisions provide direction as to how those

---

[2] As well as enacting the model code required by the statute, LCDC has enacted a variety of rules that guide cities and other covered local governments in implementing the middle housing statute, some of which we discuss below. *See* OAR 660-046-000 - 660-046-0370 (providing regulations guiding implementation).

regulations shall be implemented in relation to Middle Housing, as required by this rule.

"* * * * *

"(e)   Goal 11: Public Facilities and Services—Pursuant to OAR 660-011-0020(2), a public facility plan must identify significant public facility projects which are to support the land uses designated in the acknowledged comprehensive plan. This includes public facility projects to support the development of Middle Housing in areas zoned for residential use that allow for the development of detached single-family dwellings. Following adoption of Middle Housing allowances by a Large City, the Large City shall work to ensure that infrastructure serving undeveloped or underdeveloped areas, as defined in OAR 660-046-0320(8), where Middle Housing is allowed is appropriately designed and sized to serve Middle Housing."

The legislature also permitted a city to seek an extension of time to adopt regulations or amend its comprehensive plan for an area where it has identified certain infrastructure and transportation services "that are either significantly deficient or are expected to be significantly deficient before December 31, 2023," and where it has identified a plan that will remedy the deficiency. Or Laws 2019, ch 639, § 4(1), (2). Accordingly, the Department of Land Conservation and Development (DLCD) implemented a program for those extensions. *See* OAR 660-046-0300 - 660-046-0370. It is undisputed that the City of Eugene, which is considered a large city under the middle housing regulations,[3] did not seek an extension.

The City of Eugene adopted its own ordinance, Ordinance No. 20667, that amended portions of the Eugene Code and portions of the Metro Plan. The city went further in its ordinance than the requirements of the middle housing statute by not just allowing middle housing but encouraging and even incentivizing the development of middle housing in the city.

As explained above, in the middle housing statute, the legislature required certain cities to allow middle

---

[3] OAR 660-046-0020(8) defines a large city to include one with an "estimated population of 25,000 or more."

housing in certain areas by amending their comprehensive plans and land use regulations to that effect. Or Laws 2019, ch 639. That legislative act necessarily displaces some of the ordinary statewide land-use planning framework. *See, e.g.,* *id.* at § 3(1) (cities must amend their plans and regulations "[n]otwithstanding ORS 197.646"). What is less clear is how much of the framework it displaces. Here, as we will explain, the question is whether, when it enacted the ordinance, the city had to ensure that the Eugene Code and Metro Plan amendments allowing middle housing were consistent with Goal 11 by considering whether, and to what extent, the amendments were compatible with its existing public facilities and services. The city had amended its public facilities and services plan in 2017 (approximately five years before the adoption of the ordinance) and was already looking at an upcoming update to that plan following a grant of money from DLCD.

Recognizing that recent history and upcoming planning process, the city made certain findings when adopting the ordinance:

"The Middle Housing Code Amendments[4] do not make changes to the City's provision of public facilities and services or to the currently adopted Eugene/Springfield Public Facilities and Services Plan (PFSP). Consistent with the PFSP, the City will continue to plan and develop public facilities to support the land uses designated in the City's acknowledged comprehensive plan, including public facility projects that support the development of middle housing. Therefore, the amendments are consistent with Statewide Planning Goal 11.

"The City of Eugene updated the PFSP during the adoption of Eugene Urban Growth Boundary in 2017 to ensure that all residential lands could be served. More recently, the City of Eugene and City of Springfield received a grant from [DLCD] on October 6, 2021 to update the PFSP, including

---

[4] We understand the City and LUBA's references to the "Middle Housing Code Amendments" or sometimes abbreviated by LUBA as "MHA" to refer to the *entire* ordinance, which both amended the Eugene Code's land use provisions and amended the Metro Plan to account for the legislature's requirement to allow middle housing. Throughout this opinion, we use "the ordinance" to refer to the entirety of Ordinance No. 20667 and, whenever possible, adjust quoted material from the LUBA record to be consistent with our use of that term.

updates specifically focused on supporting housing devel-
opment. Consistent with [OAR 660-046-0010(3)(e)], follow-
ing adoption of the Middle Housing Code Amendments, the
City will work to ensure that infrastructure serving areas
where middle housing is allowed, including any undevel-
oped or underdeveloped areas as defined in OAR 660-046-
0320(8), is appropriately designed and sized to serve the
land uses allowed by the City's comprehensive plan and
land use regulations, including middle housing uses."

With that legal and factual background, we turn to
petitioners' argument. Before LUBA, petitioners contended
that, contrary to the city's statement that the amendments
"do not make changes to the City's provision of public facili-
ties and services," the amendments would result in changes
in the city's provision of public facilities and services because
they allowed an increase in density in residential zones
throughout the city. Petitioners asserted that the city's find-
ings "represent, at best, a non-binding promise that the
City will eventually address Goal 11 compliance when the
PFSP is amended." Petitioners contend that, consequently,
the findings did not demonstrate that the amendments *cur-
rently* complied with the statewide land use planning goals.
Petitioners relied on *Friends of Yamhill County v. Yamhill
County*, 47 Or LUBA 160 (2004), for the proposition that
compliance issues with statewide planning goals raised by
post-acknowledgment plan amendments must be addressed
and resolved at the time the plan amendment is adopted.
Petitioners maintained that the city could have brought the
amendments into current compliance with Goal 11 in any
of several ways: It could have updated its public facilities
and services plan; "enacted the DLCD Model Code (which
includes a restriction on development if there is insufficient
infrastructure)"; or simply undertaken a study "to predict
the increased impacts on the Goal 11 facilities." (Footnote
omitted.)

LUBA rejected that argument. First, it stated that
the 2017 public service facilities plan contemplated the
impacts of increased development through in-fill and rede-
velopment. It then noted that it was "unclear whether and to
what extent the [ordinance] will result in increased density."
Regardless, it concluded,

"even if the city had determined that the [ordinance] will result in increased density that exceeds existing infrastructure or planned infrastructure improvements, Goal 11 does not require that the city amend the PFSP to evaluate the adequacy of its infrastructure prior to or concurrently with adopting the [ordinance]."

We understand LUBA to have concluded that, although Goal 11 applied to the city's amendments to the Metro Plan and the Eugene Code, Goal 11 does not mandate that the city consider whether the amendments would allow development without compliance with Goal 11 or amend its public facilities and services plan contemporaneously with adopting the amendments. LUBA later (when analyzing the ordinance's compliance with a local planning policy with similar text) noted that the dictionary definition of the term "coordinate" includes "to bring into a common action, movement, or condition," which, LUBA said, did not require contemporaneous action.

On review, petitioners renew the basic argument that they made before LUBA, contending that, when it adopted the ordinance, the city was required, and failed, to demonstrate that the plan and regulations as amended complied with Goal 11 and, consequently, with the existing public facilities and services plan. They note that the ordinance post-dated the existing 2017 public facilities and services plan and so, necessarily, the plan did not contemplate the type of infill and increased density that will result from the ordinance. Petitioners also take issue with LUBA's characterization of their argument as being that the city had to *amend* the public facilities and services plan when it adopted the ordinance, pointing out that they argued that the city only had to consider and explain how the ordinance was consistent with Goal 11, not that it necessarily had to amend the plan. Noting LUBA's focus on the term "coordinate" from Goal 11, they also contend that, to accomplish Goal 11's mandate that the city "coordinates the type, locations and delivery of public facilities and services in a manner that best supports the existing and proposed land uses," OAR 660-015-0000(11), when the city adopts provisions allowing new land uses, the city has to consider the

relationship between those new uses and its existing plan for public facilities and services.

To satisfy ORS 197.175(2)(a), cities and counties "shall *** amend and revise" their comprehensive plans "in compliance with" the statewide planning goals. Further, the city's own code provides that the council shall apply certain criteria in approving or denying an application to amend the Metro Plan, including that "[t]he proposed amendment is consistent with the relevant Statewide Planning Goals." EC 9.7735(1). And, the city may amend its land use code when the amendment "[i]s consistent with applicable state-wide planning goals" and "with applicable provisions of the comprehensive plan and applicable adopted refinement plans." EC 9.8065(1), (2); *see also* ORS 197.175(2)(b) (cities and counties must enact land use regulations "to implement their comprehensive plans"). Those requirements are stated in the present tense. They do not allow the city to amend the plan and regulations based on an assertion, like the one the city made here regarding Goal 11, that, at some point in the future, the city *will* update its plans to account for development allowed by the amendments in a way that *will* comply with the goals. *See Stop the Dump Coalition v. Yamhill County*, 364 Or 432, 449, 435 P3d 698 (2019) ("state and local land use laws must be consistent with the state-wide land use goals"); *see also Friends of Yamhill County*, 47 Or LUBA at 169 ("As a general principle, goal compliance issues raised by a plan amendment must be addressed and resolved at the time the plan amendment is adopted."); *1000 Friends of Oregon v. Washington County*, 17 Or LUBA 671, 683 (1989) (in adopting a post-acknowledgment plan amendment, to the extent the plan amendment implicates state-wide planning goal standards, findings addressing those goal standards are required).

In its separately filed brief, respondent Home Builders Association of Lane County argues that, in enacting the middle housing statute, the legislature intended to override the ordinary land-use framework altogether, including the requirements of ORS 197.175 and provisions like those in the Eugene Code, and exempt cities' middle housing amendments from application of the goals. As noted

above, the legislature did exempt the amendments from the ordinary post-acknowledgment plan amendment statute, ORS 197.646. However, neither the middle housing statute nor LCDC's rules implementing it reflect the intention to override application of the goals as required by ORS 197.175. Further, the middle housing law specifically exempts local government's amendments to their comprehensive plans and land use regulations from LCDC's Transportation Planning Rule, which implements Goal 12. *See* Or Laws 2019, ch 639, § 3(5) (stating that, when a local government legislatively amends its comprehensive plan or land use regulations to allow middle housing, it "is not required to consider whether the amendments significantly affect an existing or planned transportation facility"). If the legislature had intended this type of amendment to be exempt from all of the goals, that specific exemption would be meaningless.

The legislature also authorized local governments to seek extensions to update their local land use regulations or amend their comprehensive plans for specific areas "where the local government has identified water, sewer, storm drainage or transportation services that" are "significantly deficient or are expected to be significantly deficient before December 31, 2023[.]" Or Laws 2019, ch 639, § 4(1), (2). As noted, DLCD also implemented a program for seeking those extensions. OAR 660-046-0300 - 660-046-0370. That decision—to allow local governments additional time to update their land use regulations and comprehensive plans to consider their infrastructure needs in light of the new middle housing law—supports an inference that the legislature intended to continue to require local governments to comply with statewide planning goals and rules related to public facilities and services.

Further, although the parties debate the meaning of OAR 660-046-0010(3), we conclude that it supports our understanding that adoption of the amendments mandated by the middle housing statute must follow regularly applicable procedures, albeit on a dramatically expedited timeline. That provision states, in part, that

"a public facility plan must identify significant public facility projects which are to support the land uses designated

in the acknowledged comprehensive plan. *This includes public facility projects to support the development of Middle Housing in areas zoned for residential use that allow for the development of detached single-family dwellings.* Following adoption of Middle Housing allowances by a Large City, the Large City shall work to ensure that infrastructure serving undeveloped or underdeveloped areas * * * where Middle Housing is allowed is appropriately designed and sized to serve Middle Housing."

OAR 660-046-0010(3)(e) (emphasis added). As we understand it, the italicized sentence demonstrates LCDC's expectation that, when cities adopt the amendments required by the statute, they will engage in some version of the ordinarily required planning for public facilities and services. Although updating the public facilities and services plan likely was not feasible on the schedule that the legislature imposed, as petitioners pointed out before LUBA, there were other ways to achieve compliance with Goal 11, like adopting provisions similar to those in the model code that limit middle housing on lots that lack sufficient infrastructure to support it, at least until the public facilities and services plan update was complete.

In sum, LUBA erred when it affirmed the city's conclusion that it did not have to consider the impact of the amendments to the Eugene Code and Metro Plan on its provision of public facilities and services at the time it adopted them.[5]

We turn to petitioners' second assignment of error, which requires a different analysis. As we understand it, petitioners contend that LUBA erred in affirming the city's construction of the applicable law and in applying its standard of review when it affirmed the city's findings that the ordinance was not out of compliance with Goal 15 (relating to development on the Willamette River Greenway) because it did not implicate that goal. As we discuss below, the city essentially concluded that the ordinance did not make any changes to either the city's existing permitting program

---

[5] Because we conclude that LUBA erred in applying state law and regulations to the city's decision to amend the Metro Plan and Eugene Code via the ordinance, we do not address petitioners' separate argument that LUBA erred when applying Metro Plan Policy A.12 to the city's decision.

governing development in the Willamette River Greenway or provide for any specific development in the greenway. As a result, the city concluded that the ordinance did not implicate Goal 15. LUBA agreed with the city's construction of the controlling law. So do we.

The purpose of Goal 15 is "[t]o protect, conserve, enhance and maintain the natural, scenic, historical, agricultural, economic and recreational qualities of lands along the Willamette River as the Willamette River Greenway." OAR 660-015-0005. Subparagraph C(3)(j) provides:

> "Development away from river—Developments shall be directed away from the river to the greatest possible degree; provided, however, lands committed to urban uses within the Greenway shall be permitted to continue as urban uses, including port, industrial, commercial and residential uses, uses pertaining to navigational requirements, water and land access needs and related facilities[.]"

OAR 660-015-0005(C)(3)(j). In addition, paragraph (A)(1) provides:

> "The qualities of the Willamette River Greenway shall be protected, conserved, enhanced and maintained consistent with the lawful uses present on December 6, 1975. *Intensification of uses, changes in use or developments* may be permitted after this date only when they are consistent with the Willamette Greenway Statute, this goal, the interim goals in ORS 215.515(1) and the statewide planning goals[.]"

OAR 660-015-0005(A)(1) (emphasis added).

As before, many of the background "facts" quoted in the LUBA opinion are largely a recitation of earlier enacted laws and regulations that provide context for the current dispute. As LUBA observed, the city had an existing regulatory framework for possible development in the Willamette River Greenway:

> "Pursuant to Goal 15, the city adopted a Greenway overlay and criteria for development within the Greenway. EC 9.8800 - 9.8825. Greenway permits are required for 'intensification of use, changes in uses, or developments.' EC 9.8805. The permit standards are designed to direct

development away from the river, maintain access to the river, and preserve habitat and vegetation near the river."

In adopting the ordinance, the city expressly found that Goal 15 did not apply, because the ordinance had no effect on the city's existing regulations on development in the Willamette River Greenway:

"The [ordinance] do[es] not contain any substantive changes to the City's Willamette River Greenway regulations; therefore, Statewide Planning Goal 15 does not apply. The only change to the Willamette Greenway regulations is a new citation to a renumbered code section."

Before LUBA, petitioners made the following arguments, which were then rejected by LUBA:

"First, [petitioners Conte and Nance] argue that the city's Goal 15 findings are inadequate because they do not address whether the [ordinance] will result in an intensification of uses within and that is incompatible with the Greenway. Second, [they] argue that the [ordinance] fail[s] to comply with Goal 15 because [it] allow[s] a significant intensification of housing development in the Greenway without required review of the potential impacts. * * *

"The city responds that [petitioners Conte and Nance] misapprehend the requirements of Goal 15. We agree. Goal 15 requires the city to adopt standards to review proposed development activity within the Greenway, which the city has done and which are unaffected by the [ordinance]. Goal 15, Implementation Measure 3, sets out the requirements for Greenway compatibility review, which applies to applications for specific development. A Greenway permit is required for intensification, change in use, or development of a specific property. Goal 15 does not require Greenway review for comprehensive plan and code changes that may allow increased residential density with the Greenway. Instead, Goal 15 is implemented through the city's Greenway permit program. We agree with the city that it was not required to comply with Goal 15 in adopting the [ordinance] because the [ordinance] do[es] not amend the city's Greenway permit program or allow any specific development within the Greenway. Based on that conclusion, [petitioners Conte's and Nance's] argument that the [ordinance] fail[s] to comply with Goal 15 provides no basis for remand. We conclude that the city's Goal 15 findings

are adequate to establish that the city considered the issue of the applicability of Goal 15."

(Footnote omitted.) Before us, petitioners contend that LUBA erred because it avoided petitioners' argument that the ordinance effectively allowed middle housing in zones subject to the Willamette River Greenway and Goal 15. It contends that the city also avoided consideration of the fact that the ordinance requires intensification of use in the greenway. But LUBA did not avoid that argument. It concluded that Goal 15 did not require greenway review "for comprehensive plan and code changes that may allow increased residential development within the Greenway." The ordinance did not make any changes to the greenway permitting program, and the city will have to apply that program if there is a request for development in the greenway, applying the existing permitting standards.

For similar reasons, we reject without significant discussion petitioners' argument that the ordinance does not apply clear and objective standards to housing development in the Willamette River Greenway, in violation of OAR 660-046-0010(3)(f) and ORS 197.307(4). As LUBA noted, the ordinance did not adopt or amend any standards for development in the greenway. That development will be judged by the existing standards in the greenway permitting program and not by reference to the ordinance. We reject petitioners' second assignment of error in full.

Finally, we reject petitioners' third assignment of error, which contends that LUBA also erred in upholding the ordinance because certain text in the ordinance, which defines terms such as "dwelling unit size" and "income-qualified middle housing," does not provide clear and objective standards, in violation of ORS 197.307(4). Following our review of the ordinance, we agree with LUBA that the definition of those terms in the ordinance is clear and objective.

In sum, as to petitioners' first assignment of error, we reverse LUBA's conclusion that the city did not have to consider updates to its public facilities and services plan when amending its code and Metro Plan to allow for middle housing. We therefore remand to LUBA for further proceedings. We reject petitioners' second and third assignments of

error and affirm the parts of LUBA's opinion challenged by those assignments.

Reversed in part and remanded; otherwise affirmed.